IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| NATIONWIDE EMERGING MANAGERS, LLC, | § § | No. 441, 2014 |
| Defendant/Counter-Plaintiff | § | |
| Third-Party Plaintiff Below- | § | Court Below: |
| Appellant, and | § | Superior Court of the State of |
| | § | Delaware in and for New Castle |
| NATIONWIDE CORPORATION, | § | County |
| and NATIONWIDE MUTUAL | § | |
| INSURANCE CO., | § | C.A. No. N09C-11-141 ALR |
| Defendants Below-Appellants, | § | |
| | § | |
| v. | § | |
| | § | |
| NORTHPOINTE HOLDINGS, LLC, | § | |
| Plaintiff/Counter-Defendant | § | |
| Below-Appellee, and | § | |
| | § | |
| NORTHPOINTE CAPITAL, LLC, | § | |
| PETER CAHILL, MARY | § | |
| CHAMPAGNE, ROBERT GLISE, | § | |
| MICHAEL HAYDEN, JEFFREY | § | |
| PETHERICK, STEPHEN ROBERTS, | § | |
| and CARL WILK, | § | |
| Third-Party Defendants Below- | § | |
| Appellees. | § | |

Submitted: March 4, 2015
Decided: March 18, 2015
Revised: March 27, 2015

Before **STRINE**, Chief Justice; **VAUGHN**, Justice; and **LASTER**, Vice Chancellor.[*]

Upon appeal from the Superior Court. **REVERSED**.

---

[*] Sitting by designation under Del. Const. art. IV, § 12.

Colm F. Connolly, Esquire (*argued*), Morgan, Lewis & Bockius LLP, Wilmington, Delaware, for Appellants.

Bartholomew J. Dalton, Esquire, Dalton & Associates, P.A., Wilmington, Delaware; Jaye Quadrozzi, Esquire (*argued*), Rodger D. Young, Esquire, Young & Associates, Farmington Hills, Michigan, for Appellees.

**STRINE**, Chief Justice:

## I. INTRODUCTION

When a buyer and seller negotiate a detailed contract, Delaware law requires that the contract's express terms be honored,[1] and prevents a party who has after-the-fact regrets from using the implied covenant of good faith and fair dealing to obtain in court what it could not get at the bargaining table.[2] In this case, the buyer persuaded the Superior Court to award it $15.1 million in damages when the buyer bought a 65% interest in an investment advisory firm for $25 million. The buyer's premise was that it would not have paid $25 million but for its expectancy that it would manage seven funds for three or more years. But the majority of the assets under management at the investment advisory firm were attributable to accounts other than the seven funds. As important, the contract enabled the seller to terminate the buyer's right to manage the seven funds for any reason, so long as it paid a termination fee capped at $3.5 million, and to terminate the buyer without any compensation if the seller believed its fiduciary duties required or if the buyer's performance fell below a contractual standard. And after three years, the seller could terminate the buyer as manager of the funds for any reason and owe no compensation at all.

---

[1] *See e.g.*, *Libeau v. Fox*, 880 A.2d 1049, 1056-57 (Del. Ch. 2005), *aff'd in pertinent part*, 892 A.2d 1068 (Del. 2006) ("When parties have ordered their affairs voluntarily through a binding contract, Delaware law is strongly inclined to respect their agreement . . . .").
[2] *See Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010) ("The implied covenant of good faith and fair dealing involves a cautious enterprise, inferring contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated. . . . When conducting this analysis, we must assess the parties' reasonable expectations at the time of contracting and not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal. Parties have a right to enter into good and bad contracts, the law enforces both.") (internal quotations omitted).

Instead of giving effect to the parties' contractual bargain, the Superior Court erred by implying contractual obligations on the part of the seller that were inconsistent with the contract's express terms. This enabled the buyer to obtain in litigation benefits in excess of those potentially available under the contract, and contractual protections that the buyer had failed to obtain in negotiations. We therefore reverse the judgment of the Superior Court in favor of the buyer and remand for a determination of what, if any, termination fee is due to the buyer because of the seller's termination of it as manager of the funds.

## II. FACTS[3]

### a. The Parties

NorthPointe Capital, LLC ("NorthPointe Capital") was set up in 1999 to perform sub-advisory work for mutual funds and other investment vehicles.[4] Nationwide Emerging Managers, LLC ("Nationwide") owned 65% of NorthPointe Capital, with the remaining 35% held by NorthPointe Capital's four managers. Its primary business was managing seventy accounts for institutional investors under investor-specific agreements. Those contracts constituted approximately 80% of NorthPointe Capital's assets under management. Its secondary business was providing sub-advisory services for the seven Nationwide funds that are the focus of this case. Of these seven funds, five were branded

---

[3] We rely on the undisputed facts in addressing the issues on appeal, which are entirely of a legal, not factual, nature.
[4] For the sake of clarity, we distinguish NorthPointe and NorthPointe Capital only where necessary. We otherwise refer to both entities as "NorthPointe."

as Nationwide funds, and two were branded as NorthPointe funds.[5] Six of the funds had assets under management valued at $100 million or less, but the seventh, Nationwide NVIT Mid Cap Growth Fund (the "NorthPointe NVIT"), held over $400 million in assets and was the "crown jewel" of the portfolio. That fund was a "trust fund in which Nationwide, not direct individual investors, owned the [assets] on behalf of individuals."[6] Nationwide earned a total of $15 million in profits between 1999 and 2006 as the majority member of NorthPointe Capital.[7]

### b. The 2007 Management Buy-Out

In 2006, Nationwide decided to sell its interest in NorthPointe Capital as part of a larger strategy to divest itself from direct asset management. With the help of three investors, NorthPointe Capital's four managers created NorthPointe Holdings, LLC ("NorthPointe") to buy Nationwide's interest. From late 2006 through early 2007, NorthPointe and Nationwide negotiated the sale of Nationwide's ownership stake.[8] The final sale price was $25 million, plus additional compensation owed under an earn-out provision. NorthPointe paid $16 million in cash and $9 million in the form of a subordinated note personally guaranteed by the managers. The parties signed a purchase

---

[5] The funds were: (1) Nationwide Large Cap Value Fund; (2) Nationwide Value Opportunities Fund; (3) Nationwide Mid Cap Growth Fund; (4) Nationwide Micro Cap Equity Fund; (5) NorthPointe Small Cap Value Fund; (6) NorthPointe Small Cap Growth Fund; and (7) the NorthPointe NVIT.

[6] *NorthPointe Holdings, LLC v. Nationwide Corp.*, 2014 WL 3611669, at *1 (Del. Super. July 16, 2014) [hereinafter "Opinion"].

[7] Joint. App. at 1459 (Trial Testimony of Peter Cahill, Jan. 23, 2014).

[8] Opinion at *6-7; Joint App. at 725-28 (Revised Letter of Intent, Feb. 2, 2007).

agreement on July 19, 2007 (the "Purchase Agreement"), and the deal closed on September 28, 2007.

Exhibit D of the Purchase Agreement specified Nationwide's obligations to NorthPointe after the sale, as well as remedies for breaches of the Agreement. For three years, Section 1(a) of Exhibit D (the "Termination Provision") prevented Nationwide from terminating NorthPointe's sub-advisory services, or taking any action that would cause NorthPointe's termination, for the seven funds listed on Schedule 1 of Exhibit D ("Schedule 1"). The Termination Provision provided:

> [Nationwide] hereby agrees that for a three-year period following the Closing Date . . . it shall . . . *not terminate . . . for the [Sub-Advised Funds] included on Schedule 1 . . . [NorthPointe's] sub-advisory agreement with such Sub-Advised Fund, or take any other action to cause such termination*; [but if Nationwide terminates NorthPointe's] sub-advisory agreement with [any] Sub-Advised Fund . . . , [Nationwide] shall pay a fee to [NorthPointe] in the amount set forth on Schedule 1 . . . under the name of such Sub-Advised Fund under the heading "Termination Fee" . . . ; provided further, . . . *the aggregate of all Termination Fees payable to [NorthPointe under] this subsection shall not exceed $3.5 million* and all such Termination Fees shall be paid by reducing the principal amount of the . . . Note by the amount of such Termination Fees.[9]

Accordingly, Nationwide was required to pay a "Termination Fee," capped at $3.5 million, if Nationwide terminated NorthPointe as sub-advisor for any of the seven funds during the three-year period. Schedule 1 also set forth formulas for calculating the Termination Fee for several of the funds (listed under a "Termination Fee" heading).[10]

---

[9] Joint App. at 1078 (Purchase Agreement, July 19, 2007) (emphasis added).

[10] At the bottom of Schedule 1 appeared the following:
    Termination Fee:
    [NorthPointe NVIT]
    Nationwide Value Opportunities Fund

4

The NorthPointe NVIT is the first fund to appear under the "Termination Fee" heading. Under the formulas, the total damage award would decline over the course of the three-year contractual period, so that NorthPointe's highest recovery would occur if Nationwide breached the Termination Provision early, although the award could never exceed $3.5 million because of the cap.

Under the Termination Provision, Nationwide did not have to pay any Termination Fee if one of two conditions was met. The first condition was if Nationwide "determined in good faith that its termination [is] necessary for [Nationwide] to satisfy its fiduciary obligations to the shareholders of the Sub-Advised Fund" (the "Fiduciary Exception").[11] The second was if NorthPointe failed to "satisf[y] the performance standards specified in Schedule 2" for that fund (the "Cause Exception").[12] The only performance standard relevant to this appeal required NorthPointe not to "have [a] performance rank in the bottom third of its peer group over a period of three consecutive years or five consecutive quarters" (the "Performance Period").[13] In other words, by the plain language of the

---

Nationwide Large Cap Value Fund
• (Number of whole months remaining in the Restricted Period) x (the fund net assets on the last day of the Restricted Period) x (0.0333%)
Nationwide Micro Cap Equity Fund
• (Number of whole months remaining in the Restricted Period) x (the fund net assets on the last day of the Restricted Period) x (0.0750%)

*Id.* at 1080.

[11] *Id.*

[12] *Id.*

[13] *Id.* Other performance standards required NorthPointe to refrain from doing the following:
1. knowingly or intentionally violat[ing] any law or regulation, as determined by a court or regulatory agency with jurisdiction over [NorthPointe];
2. fail[ing] to maintain its registration as an investment advisor under federal law;
3. fail[ing] to employ high quality investment personnel; [or]
. . . .

contract, Nationwide had to pay an aggregate Termination Fee of no more than $3.5 million if it terminated NorthPointe's sub-advisory agreement for any reason.[14]  But if Nationwide terminated the sub-advisory agreement because doing so was necessary to abide by its fiduciary obligations to its stockholders, or as a result of NorthPointe's sub-par performance, it would not owe NorthPointe any Termination Fee for that fund.

Section 1(b) of Exhibit D (the "Replacement Provision") included additional protection for NorthPointe related to the NorthPointe NVIT, by far the largest fund listed on Schedule 1.  The Replacement Provision provided:

> [S]ubject to [NorthPointe's] compliance with the [performance standards], [Nationwide will not] replace [NorthPointe] or engage a concurrent sub-advisor with respect to the [NorthPointe NVIT] such that, immediately after . . . such replacement . . . , [NorthPointe has] less than $300 million in assets under management in such fund . . . .[15]

The Cause Exception also applied to the Replacement Provision; that is, if the NorthPointe NVIT's performance fell below the standards established in the Purchase Agreement, Nationwide was permitted to replace NorthPointe as sub-advisor or engage another sub-advisor.

Exhibit D of the Purchase Agreement contained additional covenants binding Nationwide.[16]  But Nationwide did not promise not to open a fund that would compete

---

5. fail[ing] to materially comply with any reasonable requests by [Nationwide] for information that is in [its] possession . . . .

*Id.*

[14] The Purchase Agreement also contained a reciprocal earn-out provision, entitling Nationwide to a payment of up to $3.5 million if certain conditions applied.  *See id.* at 1021.

[15] Joint App. at 1078 (Purchase Agreement, July 19, 2007).

[16] *Id.* at 1079.  Exhibit D to the Purchase Agreement provided:

2. [Nationwide] agrees . . . that it will (i) launch a marketing campaign that will include the Sub-Advised Funds within four months after the Closing Date

with any of the seven funds, nor did it promise to manage any of the other funds it owned or controlled in any particular way. Restrictive covenants of that type are, of course, common in contracts like the Purchase Agreement.[17]

### c. Nationwide Withdraws Assets from the NorthPointe NVIT, Terminates Sub-Advisory Contracts for Five Funds, and Merges the NorthPointe NVIT with a Competing Fund

Nationwide had planned to open a new fund, the Nationwide Multi-Managed NVIT Mid Cap Growth Fund (the "Nationwide NVIT"), which would compete with the NorthPointe NVIT, before it signed the Purchase Agreement. Nationwide launched the fund in March 2008, and NorthPointe contended at trial that this marked the beginning of

---

and (ii) launch at least two additional marketing campaigns during the following two-year period that will include the Sub-Advised Funds. . . .

3. [Nationwide] agrees that it will . . . require any successor sponsor of the Nationwide Small Cap Leaders Fund to agree not to propose to the Fund Board of such fund that such fund terminate [NorthPointe's] sub-advisory agreement . . . or take any other action that would cause such termination, for the remainder of the Restricted Period.

4. [B]eginning 18 months after the Closing Date, [Nationwide may] close the Nationwide Value Opportunities Fund and/or the Nationwide Large Cap Value Fund without incurring any Termination Fees . . . , if net assets in [those funds] do not exceed $75 million. . . .

5. [Nationwide] agrees to [let] the NorthPointe Small Cap Value Fund and the NorthPointe Small Cap Growth Fund . . . continue to use the "NorthPointe" name for a period of 18 months after the Closing Date . . . .

*Id.*

[17] *See* 6 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 13:4 (4th ed.) (2014) ("It is also generally well established that a promise not to compete made by the seller accompanying the sale of a business and its goodwill to a buyer will be enforced if it is reasonably limited as to time and area, and if it does not otherwise constitute an unreasonable restraint of trade or contravene public policy."); CHARLES F. NIEMETH & DANIEL M. DUNN, COMMERCIAL CONTRACTS STRATEGIES FOR DRAFTING & NEGOTIATING, *Covenants* § 17.03[D] (2010) ("There will also be covenants with respect to actions to be taken or refrained from after the closing of the transaction. The most typical of such covenants is a noncompetition agreement by which a buyer seeks to protect itself from future competition from the seller . . . ."); 3 CORPORATE COUNSEL'S GUIDE TO ACQUISITIONS & DIVESTITURES § 38:1 (2014) ("The purchaser of a business will usually require that the seller provide a covenant not to compete as part of the sales contract.").

7

Nationwide's attempt to remove NorthPointe as sub-advisor for six of the funds before the expiration of the three-year period in violation of the Purchase Agreement. NorthPointe alleged that Nationwide deliberately capped the Nationwide NVIT's fees so that they were 12-15 basis points lower than the NorthPointe NVIT's fees, making it a more attractive investment. NorthPointe also claimed that the fee structure made it impossible for the NorthPointe NVIT to compete, because the two funds otherwise employed nearly identical investment strategies, had almost identical prospects for return, and were offered to the same clients.

Nationwide's investment activities were directed by a subsidiary called Nationwide Fund Advisors. From 2006 to 2008, the leadership of Nationwide Fund Advisors changed many times. As the Superior Court observed, each new president of Nationwide brought a different investment philosophy, which resulted in an incoherent strategy and "institutional incompetence."[18]

On June 30, 2008, Nationwide Fund Advisors appointed a new president, who withdrew assets worth $260 million from the NorthPointe NVIT the following day and then invested $135 million of the money into the Nationwide NVIT.[19] Nationwide argued at trial that it moved the assets because its independent financial advisor recommended that it do so based on NorthPointe's poor performance.

On November 25, 2008, Nationwide sent a letter to NorthPointe expressing its desire to terminate its sub-advisory contracts for four of the funds, merge the NorthPointe

---

[18] Opinion at *4.
[19] *Id.* at *12.

NVIT with the Nationwide NVIT, and "explore alternative options" for another fund, the Nationwide Value Opportunities Fund.[20] Over the course of the next year, Nationwide acted on these plans: it terminated its sub-advisory agreements for the four specified funds on December 3, 2008, merged the NorthPointe NVIT and the Nationwide NVIT on February 6, 2009, and terminated its sub-advisory agreement for the Nationwide Value Opportunities Fund on June 18, 2009. Nationwide believed that the seventh fund was meeting the Purchase Agreement's performance standards and so took no action to terminate it.[21]

According to Nationwide, the five funds that were terminated had failed to meet the performance standards, and as such, Nationwide was not obligated to pay a Termination Fee.[22] Nationwide also contended that the merger of the two NVIT funds, which removed NorthPointe as sub-advisor, was necessary because of NorthPointe's "consistently poor" performance.[23]

By contrast, NorthPointe contended that it met the performance standards for each of the six funds specified in the letter. As discussed, Nationwide could invoke the Cause Exception if NorthPointe had a performance rank in the bottom third of its peer group for three consecutive years or five consecutive quarters (what we have called the Performance Period). Although both parties conceded that the funds did not perform well after closing, the question of whether NorthPointe failed to meet the performance

---

[20] Joint App. at 1216-21 (Letter from Michael Spangler to Michael Hayden, Nov. 25, 2008).
[21] *Id.* at 1221; 1244 (Nationwide Board Minutes, Dec. 3, 2008).
[22] *Id*. at 1217-20 (Letter from Michael Spangler to Michael Hayden, Nov. 25, 2008).
[23] Joint App. at 1213 (Draft Recommendation for Disposition of the NorthPointe NVIT, Sept. 11, 2008).

9

standards turned on whether the Performance Period was intended to include the funds'

pre-closing performance. If so, based on their performance from 2006 to 2009, the funds

would not have met the standards set out in the Purchase Agreement. By contrast, if the

Performance Period was intended to begin only after closing, the Superior Court seems to

have found that Nationwide would not have been able to invoke the Cause Exception

based on NorthPointe's performance over the five quarters since closing because its

performance during that period was not so poor as to trigger Nationwide's termination

right. But obviously, not enough time would have passed to measure NorthPointe's

three-year performance from the date of closing.

## III.    PROCEDURAL HISTORY

NorthPointe filed a complaint against Nationwide in the Superior Court on

November 17, 2009, alleging fraud and breach of contract for terminating the sub-

advisory agreements, and seeking a declaratory judgment nullifying the Purchase

Agreement.[24] The parties filed a series of dispositive motions, which resulted in certain

claims being dismissed while others were added. In a Memorandum Opinion partially

granting Nationwide's motion to dismiss, the Superior Court dismissed NorthPointe's

claim that Nationwide violated the Replacement Provision because that provision did not

prohibit Nationwide from withdrawing assets from the NorthPointe NVIT without also

replacing NorthPointe as sub-advisor.[25] By the time the parties went to trial before a

---

[24] *Id.* at 52-65 (Complaint, Nov. 17, 2009).
[25] *Northpointe Holdings, Inc. v. Nationwide Emerging Managers, LLC*, 2010 WL 3707677, at *4 (Del. Super. Sept. 14, 2010).

different judge of the Superior Court,[26] NorthPointe was left with claims for fraud, breach of the express terms of the Purchase Agreement, and breach of the implied covenant of good faith and fair dealing.[27]

At trial, NorthPointe contended that Nationwide's conduct breached the terms of the Purchase Agreement and also its implied covenant of good faith and fair dealing. Because it had paid $25 million for the right to manage the seven funds, including the NorthPointe NVIT, among other things, NorthPointe argued that Nationwide's actions terminated NorthPointe's ability to manage the funds and deprived NorthPointe of the benefit of its bargain. Curiously, even as NorthPointe argued that the Superior Court should graft implied terms onto the Purchase Agreement, NorthPointe also contended that the terms of the Agreement were clear and unambiguous.

Nationwide, by contrast, argued that the conduct underlying NorthPointe's claims was expressly authorized by the Purchase Agreement. Nationwide had negotiated for the right to terminate NorthPointe without paying a fee if certain conditions were met, and it could terminate NorthPointe under any circumstances if it was willing to pay a Termination Fee, which was capped at $3.5 million. Nationwide claimed that because NorthPointe had failed to meet the performance standards specified under the Purchase Agreement, the Cause Exception applied, and thus, NorthPointe was not entitled to a Termination Fee.

---

[26] The first Superior Court judge retired while the litigation was pending.
[27] *See* Joint App. at 359-419 (Joint Pretrial Stipulation, Nov. 26, 2013).

After a two-week bench trial, the Superior Court found that Nationwide was liable for breach of the express terms of the Purchase Agreement and for breach of the implied covenant of good faith and fair dealing in that Agreement. The Superior Court found that the Nationwide witnesses were unreliable, and concluded that NorthPointe's description of the events—that Nationwide secretly planned to open a competing fund in order to drain the NorthPointe NVIT of assets and force NorthPointe out of the sub-advisor arrangement for all six funds—was persuasive. Nonetheless, the Superior Court found that NorthPointe had failed to prove its fraud claim.[28]

### a. The Superior Court Found Breaches of the Express Terms of the Purchase Agreement

The Superior Court found that Nationwide breached the Termination Provision by terminating the sub-advisory agreements for five funds (excluding the NorthPointe NVIT), and then refusing to pay Termination Fees.[29] The Superior Court rejected Nationwide's argument that NorthPointe had failed to meet the performance standards, and as such, determined that Nationwide was required to pay Termination Fees for all five funds. The Superior Court also found, without explanation, that the withdrawal of $260 million from the NorthPointe NVIT and the merger of NorthPointe NVIT into the Nationwide NVIT was a breach of the Replacement Provision, even though the Superior

---

[28] NorthPointe's fraud claim was based on the allegation that Nationwide had induced NorthPointe to enter into the Purchase Agreement with the intent to terminate the agreements. The Superior Court's finding was primarily based on NorthPointe's inability to establish the necessary intent, in part because the Nationwide Fund Advisors president who negotiated the Purchase Agreement and induced NorthPointe to agree to it in 2007 was not the same president who terminated the sub-advised funds in 2008. Opinion at *16.

[29] *Id.* at *17.

12

Court had previously concluded otherwise, and NorthPointe had not argued that it had been replaced.

### b. The Superior Court Found Breaches of the Implied Covenant of Good Faith and Fair Dealing in the Purchase Agreement

The Superior Court also found that Nationwide breached the implied covenant of good faith and fair dealing "by redeeming $260 million from the NorthPointe NVIT and reallocating it to the other funds, including $135 million into the competing [Nationwide NVIT]."[30] It found that Nationwide's "disingenuous" claim that it did not owe Termination Fees was also a breach of the implied covenant.[31] In addition, the Superior Court found that Nationwide breached the implied covenant by using a fee structure in its newly-created competitor fund that made it impossible for the NorthPointe NVIT to compete,[32] even though it determined that Nationwide did not breach any implied covenant by creating the competing fund in the first place. Finally, the Superior Court found that Nationwide breached an implied covenant by informing NorthPointe of its intent to terminate the sub-advisory agreements after business hours on a Friday, after it had informed the SEC it was closing the funds, and by refusing to accept deposits from the NorthPointe NVIT's clients.[33]

---

[30] *Id.* at *17.
[31] *Id.* at *13.
[32] *Id.* at *17.
[33] *Id.* at *13; Joint App. at 1526-27 (Trial Testimony of Peter Cahill, Jan. 24, 2014).

**c. The Superior Court Awarded Termination Fees and Damages for NorthPointe's Overpayment of the Purchase Price**

The Superior Court awarded NorthPointe $10.3 million in cash damages, plus a $4.8 million set-off of the obligation owed under a Note, for a total of $15.1 million, an amount almost five times greater than the remedy available to NorthPointe under the Purchase Agreement for the unexcused termination of all seven funds.

The Superior Court first found that liquidating the five funds triggered Nationwide's obligation to pay a Termination Fee, and awarded $605,785 based on the formulas provided on Schedule 1. The Superior Court concluded that the Termination Provision did not apply to the NorthPointe NVIT because the Purchase Agreement contained a typo, even though NorthPointe did not make this argument or bring a reformation claim before the Superior Court. Accordingly, the Superior Court did not award NorthPointe a Termination Fee for Nationwide's conduct related to the NorthPointe NVIT.[34]

The Superior Court based the remainder of its damage award on NorthPointe's alleged overpayment for Nationwide's interest in NorthPointe Capital due to Nationwide's wrongful conduct related to the NorthPointe NVIT and the other funds. In other words, the Superior Court attempted to determine the difference between the price NorthPointe paid for Nationwide's 65% interest in NorthPointe Capital, assuming a right to manage the seven funds for at least three years (and perhaps longer), and what NorthPointe would have paid without that expectancy.

---

[34] Opinion at *20-21.

The Superior Court's calculation was based entirely on NorthPointe's expert witness report, which estimated NorthPointe's "overpayment" using a cash flow analysis prepared by Merrill Lynch in 2007 to value Nationwide's 65% interest. The expert report made several adjustments to the cash flow analysis, most importantly, excluding the revenue stream from the NorthPointe NVIT. Under the revised cash flow analysis, NorthPointe's expert determined that the purchase price would have been $13 million and not $25 million. The Superior Court then added the Termination Fee for the five liquidated funds, as well as incidental damages, to the amount of NorthPointe's "overpayment." It did not determine how much of the overall award was allocated between express breaches of the contract and breaches of its implied covenant.[35] The total award was then allocated based on the ratio of cash-to-note in the original purchase, with the cash portion constituting $10.3 million, and the rest reducing the amount owed on the note by $4.8 million.[36] In other words, rather than accepting the Termination Fee—set at a maximum of $3.5 million—as the price term for NorthPointe's

_____

[35] As an example, the Superior Court found that Nationwide breached Sections 2 and 5 of Exhibit D of the Purchase Agreement, under which Nationwide promised to market the funds and to use the NorthPointe name on two of the funds. Nationwide did not challenge these findings on appeal because NorthPointe's expert report on damages, which the Superior Court used as the basis for its damage award, did not identify the amount that NorthPointe was entitled to for those breaches. Nationwide therefore accurately contends that NorthPointe cannot recover relief, having defaulted on its duty to quantify its damages. *See, e.g.*, *Gannett Co., Inc. v. Kanaga*, 750 A.2d 1174 (Del. 2000); *Henne v. Balick*, 146 A.2d 394, 396 (Del. 1958) ("The burden is upon the plaintiff to furnish [] proof [of damages]. If he fails in this respect, the [court] cannot supply the omission by speculation or conjecture."). NorthPointe's failure to even attempt to quantify harm from those breaches may be due to the fact that, in view of Nationwide's right to terminate it, NorthPointe could have no long-term expectancy that it would continue to sub-advise the funds. Because NorthPointe did not attempt to establish the amount of damages attributable to those breaches, the breaches cannot support a remedy, and the sole remaining issue on remand is whether NorthPointe is entitled to Termination Fees.
[36] *Id.* at *21-22.

15

right to manage the seven funds for the limited period specified by the Purchase Agreement, the Superior Court awarded $15.1 million in damages, which is more than 60% of the original $25 million purchase price.

## IV. ANALYSIS

On appeal, Nationwide's central argument is that the Purchase Agreement contained a specific provision providing a capped remedy of $3.5 million—the Termination Fee—for the termination of NorthPointe's sub-advisory contracts. According to Nationwide, the Superior Court erred by not adhering to the precise language in the Purchase Agreement. Nationwide first argues that the Superior Court erred by spontaneously reforming the Purchase Agreement to exclude the NorthPointe NVIT from Schedule 1 so that the Termination Provision did not apply to that fund. Second, Nationwide contends that although the merger of the NorthPointe NVIT into the competitor fund fell within the Termination Provision, NorthPointe's poor performance sub-advising that fund entitled Nationwide to terminate NorthPointe's sub-advisory agreement without paying a Termination Fee. Third, Nationwide argues that the "law of the case" doctrine prevented the Superior Court from finding that Nationwide breached the Replacement Provision because the Superior Court, in an earlier opinion written by a different judge, found that there was no basis for a claim that Nationwide breached the Replacement Provision and dismissed that claim. Finally, Nationwide contends that the Superior Court erred by finding that Nationwide breached the implied covenant of good faith and fair dealing because the express terms of the Purchase Agreement governed the subject of the conduct at issue.

16

We review the Superior Court's interpretation of a contract *de novo*[37] and will overturn any of its factual determinations only if they are clearly erroneous.[38]

## A. The Superior Court Erred by Reforming the Contract

Although the Superior Court determined that the Termination Provision applied to the five funds that Nationwide had liquidated, the Superior Court concluded that the Termination Provision did not apply to the NorthPointe NVIT because the Purchase Agreement contained a typo. Although NorthPointe did not raise this argument or request reformation before the Superior Court, the Superior Court found, based on the testimony of a single witness, that the NorthPointe NVIT was mistakenly listed on Schedule 1. It concluded that the parties had not intended for the Termination Provision to apply to the NorthPointe NVIT, despite the fact that both parties had argued that the Termination Provision did apply to that fund. On appeal, Nationwide contends that the Superior Court erred by reforming the Purchase Agreement because the evidence was far from clear that it contained a mistake. NorthPointe, by contrast, contends that the Superior Court's interpretation of the contract was reasonable in light of a latent ambiguity in the Purchase Agreement.

The decision to fix a "typographical error" in a contract is "tantamount to reforming" the contract when it has material consequences.[39] Although NorthPointe asks us to affirm the Superior Court's decision as an interpretation of a latent ambiguity, the Superior Court did not find that the Termination Provision or Schedule 1 was ambiguous.

---

[37] *Alta Berkeley VI C. V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).
[38] *Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, 68 A.3d 1208, 1220 (Del. 2012).
[39] *Brandywine Dev. Grp. v. Alpha Trust*, 2003 WL 241727, at *6 (Del. Ch. Jan. 30, 2003).

Rather, as NorthPointe contended at trial, the Agreement, which was negotiated by sophisticated parties and law firms, unambiguously showed that the Termination Provision applied to the NorthPointe NVIT. The NorthPointe NVIT was the first fund on the list of "sub-advised" funds that were subject to the Termination Provision. And in the section of Schedule 1 that provided the formulas to be used when calculating the Termination Fee, the NorthPointe NVIT is again the first fund listed. The Termination Provision would have applied to the NorthPointe NVIT under the plain language of each draft of the term sheet and the Purchase Agreement exchanged between the parties during a month-long drafting process.[40] To delete the NorthPointe NVIT from Schedule 1 and insert another fund is not interpretation of an ambiguity; it is a decision to re-write the contract.[41]

"As a matter of ordinary course, parties who sign contracts and other binding documents, or authorize someone else to execute those documents on their behalf, are bound by the obligations that those documents contain."[42] To succeed in a claim for

---

[40] Joint App. at 937 (Draft, June 20, 2007); *id.* at 1001 (Draft, July 6, 2007). The first draft did not include a schedule of the funds, but Exhibit D in that version stated that it applied to all seven funds. *Id.* at 871 (Draft, May 17, 2007).

[41] *Travelers Indem. Co. v. Reynolds Metals Co.*, 1995 WL 606317, at *2 (Del. Ch. Oct. 2, 1995) ("Reformation is, by definition, a judicial rewriting of a written contract to reflect the true intent of the parties . . . ."); CORBIN ON CONTRACTS §24.18 (2003) ("[R]eformation is . . . a request that the court alter the words of the document. This alternation may involve deleting words or punctuation, rearranging words or punctuation, or inserting words or punctuation. In contrast, a party who seeks interpretation asks the court not to change the actual words of the document but to determine the meaning of those words.").

[42] *Official Comm. of Unsecured Motors Liquidation Co. v. JPMorgan Chase Bank, N.A.*, 103 A.3d 1010, 1015 (Del. 2014); *see also* 11 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 31.5 (4th ed. 2003) ("While the parties to a contract often request the courts, under the guise of interpretation or construction, to give their agreement a meaning which cannot be found in their written understanding, based entirely on direct evidence of

18

contract reformation, the "plaintiff must show by clear and convincing evidence that the parties came to a specific prior understanding that differed materially from the written agreement."[43] But here, the Superior Court relied on a lower standard, asking only whether "the preponderance of the evidence established that Schedule 1 applied to the Nationwide [NVIT] and not the [NorthPointe] NVIT."[44] Under the correct standard, a reformation claim (if it had been made) would fail because the evidence does not clearly show that the Purchase Agreement contained an error.

As we have recited, the text of the Purchase Agreement, the example used on Schedule 1 for calculating the Termination Fee, and the bargaining history all reflect the parties' intention to include the NorthPointe NVIT under the Termination Provision. This pattern of drafting is too conspicuous to be consistent with a determination that there is clear and convincing evidence of a mistake.

Moreover, the $3.5 million Termination Fee cap also cuts against a finding that the parties intended to exclude the NorthPointe NVIT from the Termination Provision.[45] The NorthPointe NVIT was more than four times larger than each of the other six funds, and under the Schedule 1 formula for calculating the Termination Fee, the total Fee owed for

intention, and often on hindsight, the courts properly and steadfastly reiterate the well-established principle that it is not the function of the judiciary to change the obligations of a contract which the parties have seen fit to make. . . . Unless the contract is voidable due to mistake, fraud, unconcsionability, or another invalidating cause, or invalid in whole or in part due to illegality or another violation of public policy, the court must enforce it as drafted by the parties, according to the terms employed . . . .").
[43] *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1150 (Del. 2002).
[44] Opinion at *22.
[45] *E.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 203 (1981) ("In the interpretation of a promise or agreement or a term thereof, . . . an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect . . . .").

a breach of all six of the other funds would not come close to $3.5 million after the first year. As an example, the Superior Court calculated that Nationwide owed just $605,785 in damages due to Nationwide's decision to liquidate five of the funds approximately one year after closing. Only if the Superior Court had added the Fee owed for the termination of the NorthPointe NVIT would the aggregate Termination Fee have approached $3.5 million.[46] Thus, the court's own calculation is in tension with its ruling.

NorthPointe's argument on appeal that the parties intended to exclude the fund from the Termination Provision also conflicts with its assertion that the fund was the "crown jewel" of the portfolio.[47] If the fund was the most important to NorthPointe, it stands to reason that it would have wished to prevent Nationwide from terminating its sub-advisory agreement for that fund. Although careless mistakes happen, it is unlikely that the parties would have been sloppy when drafting the prominent contractual provisions applicable by their clear terms to the most valuable fund.

Finally, NorthPointe did not fairly raise a reformation claim at trial, likely because there was no colorable basis to suggest that the Termination Provision did not apply to the NorthPointe NVIT. In fact, for much of trial, NorthPointe contended that the Termination Provision applied to all seven of the funds. In its opening argument,

---

[46] This calculation assumes that the value of the NorthPointe NVIT's "net assets on the last day of the Restricted Period" was $490 million, or the value of the fund when the parties drafted the agreement. NorthPointe's expert report for damages (which the Superior Court relied on) disregarded the "last day of the Restricted Period" language in determining the Termination Fee. The report explained that using the amount on the last day of the restricted period for a fund that had been terminated would necessarily result in a termination fee of $0. *See* Joint App. at 1386 (Lawrence Simon's Expert Damages Report, Sept. 25, 2012). On appeal, neither party argues that the net asset value used in the calculation should equal the amount of assets in the fund on the last date of the restricted period.

[47] Joint App. at 1460 (Trial Testimony of Peter Cahill, Jan. 23, 2014).

NorthPointe argued that the Purchase Agreement "involves Nationwide promising not to terminate the sub-advisory agreements *on any of the seven funds* for three years."[48] Later, NorthPointe explained that the Termination Provision "states that for three years following closing, Nationwide agreed not to terminate the sub-advisory agreements *for any of the funds . . . .*"[49] And in its post-trial reply brief, NorthPointe seems to have agreed with Nationwide's contention that the Termination Provision was unambiguous and thus NorthPointe argued that it would be "improper to consider parol evidence" when interpreting that Provision.[50] Confusingly, in that same brief, NorthPointe argued that errors in the Purchase Agreement "cast grave doubt on whether [the Termination Provision] . . . is intended to encompass all seven funds."[51]

Because contract reformation is a well-understood claim and NorthPointe did not fairly raise it, the Superior Court should not have spontaneously reformed the contract. Even if the reformation claim had been fairly raised, the record does not contain clear and convincing evidence that would support reformation. Therefore, the Superior Court erred by reforming the contract to omit the NorthPointe NVIT from Schedule 1. On remand, the parties are bound by the plain terms of the Agreement: Nationwide could not terminate NorthPointe as sub-advisor of any of the seven funds, including the

---

[48] *Id.* at 518 (Nationwide's Post-Trial Closing Brief, Apr. 4, 2014) (quoting NorthPointe's opening statement at trial) (emphasis added).

[49] *Id.* at 458 (NorthPointe's Post-Trial Brief, Feb. 24, 2014) (emphasis added).

[50] *Id.* at 585 (NorthPointe's Post-Trial Reply Brief, Apr. 22, 2014) ("The . . . parol evidence should be ignored. . . . Nationwide contends that [the Termination Provision] is unambiguous as a matter of law. But where a provision is unambiguous, consideration of parol evidence . . . is improper.").

[51] *Id.* at 583 (NorthPointe's Post-Trial Reply Brief, Apr. 22, 2014).

NorthPointe NVIT, without paying a Termination Fee, or showing that the termination fell under the Fiduciary Exception or the Cause Exception.

## B. The Merger of the NorthPointe NVIT into the Nationwide NVIT Caused NorthPointe's Termination and Thus Breached the Termination Provision

Although the parties do not dispute whether the Termination Provision applied to the five funds that Nationwide liquidated, they contest whether the merger between the competing NVIT funds fell within that provision. Nationwide contends that Nationwide's decision to merge the NorthPointe NVIT with the Nationwide NVIT is governed by the Termination Provision because the merger caused NorthPointe's termination as sub-advisor. NorthPointe argues in response that the Termination Provision did not apply because it is not clear that NorthPointe's sub-advisory agreement was terminated after the merger. It does not dispute that the merger led to NorthPointe's effective termination as sub-advisor for the NorthPointe NVIT.

Because the merger of the two competing NVIT funds caused the termination of NorthPointe's sub-advisory agreement, it could only be undertaken within three years of closing if Nationwide paid NorthPointe a Termination Fee or successfully invoked one of the contractual exceptions. Under the Termination Provision, Nationwide promised not to terminate or "take any other action to cause" the termination of NorthPointe's sub-advisory agreement for any of the seven funds for the three-year contractual period.[52] In other words, NorthPointe negotiated for broad protection for itself against any action by Nationwide that would result in the termination of its services.

---

[52] *Id*. at 1078 (Purchase Agreement, July 19, 2007).

22

It is undisputed that the NorthPointe NVIT was "liquidated and dissolved" after the merger.[53]  It is also undisputed that, after the merger, NorthPointe lost its ability to earn revenue by sub-advising the NorthPointe NVIT.  As Nationwide expert Erik Sirri testified, "[when you merge funds,] the sub-advisory agreements of the liquidated funds are terminated."[54]  Similarly, NorthPointe witness Peter Cahill admitted that NorthPointe's sub-advisory agreement was "nullified" after the merger.[55]  Because the merger caused the termination of NorthPointe's sub-advisory agreement for the NorthPointe NVIT for purposes of the Termination Provision, the Superior Court should have considered whether NorthPointe was entitled to a Termination Fee, or whether the Cause or Fiduciary Exception applied.

### C. The Superior Court Erred by Interpreting the Termination Provision to Exclude NorthPointe's Performance Before Closing Without Any Explanation

At trial, the parties disputed whether Nationwide owed Termination Fees for the funds that were liquidated.  Nationwide argued that NorthPointe failed to meet the performance standards because each of the terminated funds had "a performance rank in the bottom third of its peer group over a period of three consecutive years or five consecutive quarters."[56]  The Superior Court disagreed, and found that NorthPointe was entitled to Termination Fees.  In reaching this conclusion, the Superior Court accepted, without explanation, NorthPointe's argument that the Performance Period ran from the

---

[53] Joint App. at 154-55 (Third Amended Complaint, May 31, 2012);1242 (Nationwide Board Minutes, Dec. 3, 2008).

[54] *Id*. at 1639 (Trial Testimony of Erik Sirri, Jan. 31, 2014).

[55] *Id.* at 1558 (Trial Testimony of Peter Cahill, Jan. 24, 2014).

[56] *Id.* at 1081 (Purchase Agreement, July 19, 2007).

23

date of closing, and not before closing (*i.e.*, "prospectively and not retroactively").[57] On appeal, Nationwide argues that the Superior Court erred by interpreting the Performance Period in this way, and that because all six of the terminated NorthPointe funds had an impermissibly low performance rank for a three-year period that began before closing, NorthPointe is not entitled to any Termination Fees.

We are reluctant to rule on this issue in the first instance because the question of whether NorthPointe met the performance standards for each of the six terminated funds is a complicated factual determination, and we do not have sufficient analysis from the Superior Court to guide us. We only note that NorthPointe's argument that the Performance Period ran from the date of closing would, if accepted, render one of the important metrics for performance superfluous.[58] The Termination Provision remained in effect for only three years after closing. After that point, Nationwide had no obligation to retain NorthPointe as a sub-advisor, and would not owe Termination Fees regardless of the reason for termination. Therefore, under NorthPointe's interpretation, Nationwide would not be able to rely on the three-year benchmark under the Cause Exception until its contractual obligation not to terminate NorthPointe expired altogether. Moreover,

---

[57] Opinion at *11. NorthPointe contended at trial that the standards should be applied prospectively because otherwise it would have been in violation of the standards at the time it entered into the Purchase Agreement.

[58] *See Intel Corp. v. Am. Guarantee & Liab. Ins. Co.*, 51 A.3d 442, 451 (Del. 2012) ("[N]o part of an agreement should be rendered superfluous."); *Axis Reinsurance Co. v. HLTH Corp.*, 993 A.2d 1057, 1063 (Del. 2010) ("[A] court will not adopt [an] interpretation that leads to unreasonable results, but instead will adopt the construction that is reasonable and that harmonizes the affected contract provisions."); RESTATEMENT (SECOND) OF CONTRACTS § 203 (1981) ("In the interpretation of a promise or agreement or a term thereof, . . . an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, *or of no effect . . . .*") (emphasis added).

NorthPointe was "at all times" required to meet the specified performance standards. This broad contractual language suggests that the NorthPointe's pre-closing performance should have been considered. We thus vacate the Superior Court's ruling on this issue and remand for new consideration of the Purchase Agreement's meaning and application.

### D. The Superior Court Erred by Finding that Nationwide Breached the Replacement Provision

At trial, NorthPointe contended that Nationwide's conduct related to the NorthPointe NVIT breached the Replacement Provision. Nationwide argued in response that the Superior Court was barred from reaching that conclusion because the Superior Court, in an opinion by a judge who had since retired, previously dismissed that exact claim.[59] In its second ruling, the Superior Court disagreed with Nationwide, finding that "law of the case" doctrine did not bar the claim. The Superior Court then concluded that Nationwide's conduct related to the NorthPointe NVIT breached the Replacement Provision, without providing an explanation.[60]

We agree with Nationwide that the "law of the case" doctrine prevented the Superior Court from considering whether Nationwide breached the Replacement Provision. In its earlier opinion, the Superior Court reasoned that because NorthPointe had not shown that it had been replaced as sub-advisor of the NorthPointe NVIT, there could be no breach of the Replacement Provision.[61] Under the "law of the case doctrine,"

---

[59] *See Northpointe Holdings, Inc. v. Nationwide Emerging Managers, LLC*, 2010 WL 3707677, at *4 (Del. Super. Sept. 14, 2010).
[60] Opinion at *2 n.1; *18.
[61] *Northpointe Holdings*, 2010 WL 3707677, at *4 ("[Nationwide is] alleged to have created a new fund identical to the [NorthPointe NVIT] . . . [and] then transferred a large amount of assets

25

a court's legal ruling at an earlier stage of proceedings controls later stages of those proceedings, provided the facts underlying the ruling do not change.[62] Here, the factual basis for the Superior Court's first ruling did not change: as in 2010, the conduct that the Superior Court considered was Nationwide's decision to withdraw funds from, and eventually terminate by merging, the NorthPointe NVIT. The "law of the case" doctrine therefore barred the Superior Court from finding that such conduct breached the Replacement Provision.

Moreover, there was no error or injustice, much less a clear one, stemming from the first ruling that would justify re-consideration.[63] As NorthPointe admitted at trial, "it is true that nothing in the Purchase Agreement *expressly* prohibited Nationwide from secretly creating a competing fund, or moving money out of the NorthPointe-managed fund, . . . or merging [the competing NVIT funds]."[64] And NorthPointe did not argue that it had been replaced at trial or on appeal. Nor do the facts support that conclusion. Although the Purchase Agreement did not define "replace," and the Superior Court did not define the term, it is not an unusual one.[65] Webster's Dictionary defines "replace" as

_____

. . . to the new fund, and then agreed with [NorthPointe's] competitors to sub-advise the new fund. NorthPointe alleges that this conduct violated express terms of the agreement because the Purchase Agreement required [Nationwide] not to replace [NorthPointe] or engage a concurrent sub-advisor. That is not the conduct alleged here. The contract, at least in the provision cited, does not prohibit this behavior and therefore this claim must fail.").

[62] *See Hoskins v. State*, 102 A.3d 724, 729 (Del. 2014); 47 AM. JUR. 2D *Judgments* § 469 (2015).

[63] *See, e.g.*, 47 AM. JUR. 2D *Judgments* § 469 (2015) ("Yet the doctrine is not inflexible in that, unlike *res judicata,* it is not an absolute bar to reconsideration of a prior decision that is clearly wrong, produces an injustice or should be revisited because of changed circumstances.").

[64] Joint App. at 472 (NorthPointe's Post-Trial Brief, Feb. 24, 2014).

[65] *See Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006) ("Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract."); 11 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW

"to take the place of, especially as a substitute or successor."[66] Here, it is undisputed that the NorthPointe NVIT was legally dissolved at the end of the merger, and thus, no advisor could "take the place of" NorthPointe as sub-advisor.

That interpretation of the term "replace" is most faithful to the plain language of the Purchase Agreement. Unlike the Termination Provision, which is written in broad terms to prohibit any conduct causing NorthPointe's termination, the Replacement Provision is narrow and prevents specific conduct: starving NorthPointe of revenue by hiring a new advisor for the NorthPointe NVIT.

That interpretation also matches the intent of the parties as evidenced by the drafting history relied on by the Superior Court.[67] The Superior Court observed that NorthPointe had a "searing memory of a prior business relationship where another sub-advisor was added and the relevant fund lost assets."[68] The Replacement Provision was created "to address this very specific fear and provides a well-delineated protection. Specifically, according to [Nationwide's expert witness John] Grady, there would be protections for NorthPointe if Nationwide caused economic harm but did not terminate the subadvisory relationship."[69] In other words, the Replacement Provision provided extra protection for NorthPointe if Nationwide took action short of full termination, and

---

OF CONTRACTS § 32:3 (4th ed.) (2014) ("The plain, common, or normal meaning of language will be given to the words of a contract unless the circumstances show that in a particular case a special meaning should be attached to them.").

[66] WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 999 (1988).

[67] *See Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) ("When there is uncertainty in the meaning and application of contract language, the reviewing court must consider the [extrinsic] evidence offered in order to arrive at a proper interpretation of contractual terms.").

[68] Opinion at *9.

[69] *Id.* (emphasis added).

prevented Nationwide from depriving NorthPointe of the ability to manage $300 million in assets without terminating NorthPointe and thereby triggering Nationwide's obligation to pay a Termination Fee.

Under the Replacement Provision, Nationwide would only be in breach if it brought on a new sub-advisor to manage part or all of the assets in the NorthPointe NVIT. Accordingly, the Superior Court's earlier conclusion on that point was sound, and the Superior Court erred by later determining that Nationwide breached the Replacement Provision.

### E. The Superior Court Erred by Finding that Nationwide Breached the Implied Covenant of Good Faith and Fair Dealing

The Superior Court found that Nationwide breached the implied covenant of good faith and fair dealing because Nationwide supposedly deprived NorthPointe of the benefit of its bargain under the Purchase Agreement—namely, that it would have the right to manage seven funds for three years or be entitled to Termination Fees. In particular, the Superior Court found that Nationwide's refusal to pay Termination Fees because of NorthPointe's poor performance was "disingenuous."[70] It also determined that Nationwide had breached an implied covenant by redeeming $260 million in assets from the NorthPointe NVIT. And although the Superior Court found that Nationwide's decision to launch a competing fund was not a breach of an implied covenant, it determined that implementing a lower fee structure for the new fund was a breach. Nationwide contends that these rulings were erroneous. We agree.

---

[70] *Id.* at *13.

28

The "implied covenant of good faith and fair dealing involves . . . inferring contractual terms to handle developments or contractual gaps that . . . neither party anticipated."[71] It does not apply when the contract addresses the conduct at issue.[72] Therefore, the Superior Court erred by finding that Nationwide's refusal to pay Termination Fees breached both the Termination Provision and an implied covenant. Under the Purchase Agreement, if Nationwide chose to terminate NorthPointe during the three-year period, it would be required to pay a Termination Fee unless it invoked the Cause or Fiduciary Exception successfully. Accordingly, the express terms of the contract governed, and Nationwide's refusal to pay was either a breach of the Termination Provision or not a breach at all if one of the exceptions applied.

And although the Superior Court found that NorthPointe's refusal to pay Termination Fees was disingenuous, Nationwide did not necessarily act in bad faith by refusing to pay a Termination Fee. The Purchase Agreement contemplated that Nationwide could invoke the Fiduciary or Cause Exception, and if Nationwide failed to prove that the exception applied in any litigation between the parties, pre-judgment interest would compensate NorthPointe for the delay, as is ordinary in litigation. If Nationwide's litigation premise that the Fiduciary and Cause Exceptions applied was

---

[71] *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010) (internal quotations omitted).
[72] *See, e.g.*, *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) ("Existing contract terms control, however, such that implied good faith cannot be used to circumvent the parties' bargain, or to create a free-floating duty . . . unattached to the underlying legal document.") (internal quotations omitted).

frivolous and advanced in bad faith, that could also be remedied under the bad faith exception to the American Rule.[73]

The Superior Court's finding that Nationwide breached the implied covenant by making a large withdrawal from the NorthPointe NVIT was also in error. An interpreting court cannot use an implied covenant to re-write the agreement between the parties,[74] and "should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it."[75] Here, the parties negotiated a specific term that prevented Nationwide from redeeming assets while simultaneously replacing NorthPointe or engaging another sub-advisor for the NorthPointe NVIT. The Purchase Agreement does not prevent Nationwide from redeeming assets in the NorthPointe NVIT by itself. It was therefore an error for the Superior Court to imply such a term without evidence that the parties would have agreed to such a restriction.

---

[73] *See, e.g.*, *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 545-46 (Del. 1998) ("The United States Supreme Court has used the bad faith exception to the American Rule [requiring each side to pay its own litigation costs] to uphold the award of attorneys fees. This Court has also previously accepted bad faith conduct of a party to the litigation as a valid exception to the American Rule.").

[74] *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998) ("Delaware observes the well-established general principle that . . . it is not the proper role of a court to rewrite or supply omitted provisions to a written agreement."); *Am. Capital Acquisition Partners, LLC v. LPL Holdings, Inc.*, 2014 WL 354496, at *5 (Del. Ch. Feb. 3, 2014); *Winshall v. Viacom Int'l, Inc.*, 55 A.3d 629, 636-37 (Del. Ch. 2011) ("[T]he implied covenant of good faith and fair dealing should not be applied to give plaintiffs contractual protections that they failed to secure for themselves at the bargaining table. . . . [T]he implied covenant is not a license to rewrite contractual language . . . . Rather, a party may only invoke the protections of the covenant when it is clear from the underlying contract that the contracting parties would have agreed to proscribe the act later complained of had they thought to negotiate with respect to that matter.") (internal citations and quotations omitted), *aff'd*, 76 A.3d 808 (Del. 2013).

[75] *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1035 (Del. Ch. 2006).

When a court implies a term in a contract, much less one as detailed as the Purchase Agreement, it must be very careful.[76]  By necessity, any argument by a party that another party breached an implied term invites consideration of evidence of the parties' bargaining history.[77]  Here, the drafting history resolves any uncertainty about whether the parties would have agreed to be bound by contractual language of this kind. An early draft of the Purchase Agreement proposed by NorthPointe included a version of the Replacement Provision that provided: "[Nationwide] shall . . . not redeem shares in the [NorthPointe NVIT] such that [Nationwide] would have less than $300 million invested in such fund."[78]  Nationwide rejected this language, explaining in an email that "we cannot promise not to redeem shares out of the [NorthPointe NVIT] since those shares are actually reflective of contract-level allocations made by holders of VA and/or VL products.  What we can promise [is] . . . not to replace NorthPointe or engage another subadvisor on this Fund such as to make NorthPointe the manager of less than $300

---

[76] *See Nemec*, 991 A.2d at 1125 ("The implied covenant of good faith and fair dealing involves a cautious enterprise, inferring contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated. . . .  We will only imply contract terms when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected.  When conducting this analysis, we must assess the parties' reasonable expectations at the time of contracting and not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal.  Parties have a right to enter into good and bad contracts, the law enforces both.") (internal quotations omitted); *Cincinnati SMSA Ltd. P'ship*, 708 A.2d at 992 (noting that use of the implied covenant of good faith and fair dealing should be "rare and fact-intensive, turning on issues of compelling fairness"); *Allen v. El Paso Pipeline GP Co.*, 2014 WL 2819005, *11 (Del. Ch. 2014) (noting that the Delaware Supreme Court has "admonish[ed] against a free-wheeling approach" to invoking the implied covenant of good faith and fair dealing), *aff'd*, 2015 WL 803053 (Del. 2015).
[77] *See, e.g.*, *Eagle Indus.*, 702 A.2d at 1232 ("When there is uncertainty in the meaning and application of contract language, the reviewing court must consider the [extrinsic] evidence offered in order to arrive at a proper interpretation of contractual terms.").
[78] Joint App. at 934 (Draft, May 17, 2007).

million of fund assets . . . ."[79] In other words, NorthPointe sought protection against asset redemption, but lost at the bargaining table.[80] Because the implied covenant "cannot properly be applied to give the plaintiffs contractual protections that they failed to secure for themselves,"[81] the Superior Court erred by finding that Nationwide's decision to redeem assets from the NorthPointe NVIT breached an implied covenant.

The Superior Court also erred by finding that Nationwide's decision to set a lower fee structure for its competitor fund breached an implied covenant. That conclusion conflicted with the court's finding that launching the competing fund was not a breach. If Nationwide could fairly create a competing fund and compete on other dimensions, it does not seem commercially sensible to infer that Nationwide had an implied duty to refrain from competing with the NorthPointe NVIT on the specific dimension of price. Moreover, a court can only imply terms when it is "clear from the [contract] that [the parties] would have agreed to" the omitted terms.[82] But the Purchase Agreement did not contain restrictions or non-compete provisions of any kind, which are common in contracts of this type. Nor did the Superior Court point to evidence suggesting that Nationwide would have agreed to refrain from offering lower prices in its competitor

---

[79] Joint App. at 944 (Email from John Grady to Harry Hallowell, July 3, 2007)

[80] *See Nemec*, 991 A.2d at 1126 ("The implied covenant only applies to developments that could not be anticipated, not developments that the parties simply failed to consider—particularly where the contract authorizes the [party] to act exactly as it did here."); *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 707 (Del. Ch. 2004) ("When, as is the case here, the relevant contracts expressly grant the plaintiffs certain rights, . . . the court cannot read the contracts as also including an implied covenant to grant the plaintiff additional unspecified rights . . . . To do so would be to grant the plaintiffs, by judicial fiat, contractual protections that they failed to secure for themselves at the bargaining table."), *aff'd*, 861 A.2d 1251 (Del. 2004).

[81] *Winshall v. Viacom Int'l Inc.*, 76 A.3d 808, 816 (Del. 2013).

[82] *Id.*

funds. As such, the Superior Court had no basis to conclude that Nationwide breached an implied covenant when it implemented a desirable fee structure in its newly-created fund.

Finally, the Superior Court also erred by finding that there was an implied agreement that NorthPointe would have the right to manage the seven funds for three years, and that the $25 million purchase price was predominantly premised on that expectancy. The Superior Court's award of $15.1 million to NorthPointe, which is more than 60% of the purchase price, overlooks the reality that the seven Nationwide-owned funds only composed 20% of the assets under management at NorthPointe Capital. Therefore, any notion that the only material value received under the Agreement was the right to manage the seven funds is without merit. Even if Nationwide had terminated NorthPointe as sub-advisor for all seven funds immediately after closing, NorthPointe would still have received substantial value as the sole owner of NorthPointe Capital.

As important, the Superior Court erred by not recognizing that the parties had already priced the limited expectancy NorthPointe had in the seven funds: a maximum of $3.5 million for the termination of all seven funds within a discrete and commercially brief three-year period. That expectancy was further limited by the reality that after the three-year period expired, Nationwide could terminate NorthPointe as to any and all funds for any reason and owe NorthPointe no compensation. When parties price their own assets explicitly, Delaware courts must respect that economic allocation and not imply a different bargain than that reflected under the express terms of the contract.[83]

---

[83] *See, e.g.*, *Nemec*, 991 A.2d at 1127 ("The implied covenant will not infer language that contradicts a clear exercise of an express contractual right.); *Fisk Ventures, LLC v. Segal*, 2008

Therefore, the Superior Court erred by finding that NorthPointe was entitled to an award nearly five times the size of the Termination Fee cap, or the maximum award for the unjustified termination of all seven funds.

## V. CONCLUSION

We therefore reverse the final judgment of the Superior Court. On remand, the Superior Court should determine whether NorthPointe is entitled to Termination Fees, capped at $3.5 million, for terminating NorthPointe as sub-advisor of six funds, including the NorthPointe NVIT, within three years of closing, or whether Nationwide can invoke the Cause or Fiduciary Exception.

---

WL 1961156, at *10 (Del. Ch. May 7, 2008) ("[B]ecause the implied covenant is, by definition, implied, and because it protects the spirit of the agreement rather than the form, it cannot be invoked where the contract itself expressly covers the subject at issue.").