# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

VERDANTUS ADVISORS, LLC, )
)
Plaintiff, )
)
v. ) C.A. No. 2020-0194-KSJM
)
PARKER INFRASTRUCTURE )
PARTNERS, LLC, THE JEFFREY A. )
PARKER TRUST, THE CARL P. )
FEINBERG REVOCABLE TRUST, )
JEFFREY A. PARKER, and CARL P. )
FEINBERG, )
)
Defendants. )

## ORDER GRANTING PARTIAL MOTION TO DISMISS[1]

1. Defendant Parker Infrastructure Partners, LLC ("Parker Infrastructure" or the "Company") is a Delaware limited liability company that provides consulting services to public infrastructure projects. The Company has four members: Plaintiff Verdantus Advisors, LLC ("Verdantus") owns 5% of the Company's membership interests; Defendant The Jeffrey A. Parker Trust (the "Parker Trust") owns 38.75%; Defendant The Carl P. Feinberg Revocable Trust (the "Feinberg Trust") owns 51.25%; and non-party Beverly Scott and Associates, LLC owns 5%.

---

[1] The facts are drawn from the Verified Amended Complaint and documents it incorporates by reference. C.A. No. 2020-0194-KSJM, Docket ("Dkt.") 12, Verified Am. Compl. ("Am. Compl.").

2.     The Company is managed by its Managers.  At all relevant times, the Managers comprised Defendant Jeffrey A. Parker, Defendant Carl. P. Feinberg, and non-party Beverly A. Scott.  Until November 14, 2019, Michael Phillips, the sole owner of Verdantus, also served as a Manager.  Under the Second Amended and Restated Limited Liability Company Agreement of Parker Infrastructure Partners, LLC (the "LLC Agreement"),[2] the Managers appoint a President and CEO, who has "general and active management of the day-to-day operations."[3]  The Managers appointed Parker as President and CEO.[4]

3.     On July 1, 2017, Verdantus entered into a Consultant Agreement[5] with the Company whereby Verdantus agreed to provide consulting and advisory services in exchange for a monthly retainer plus reimbursement of expenses.  The Consultant Agreement was cancellable by either party without cause on thirty days written notice.  The Company had similar consultant agreements with its other members as well.  Each year, the Managers approved payments under these consultant agreements as part of the Company's budgeting process.

---

[2] Am. Compl. Ex. A.

[3] *Id.* § 4.1(a).

[4] *Id*.

[5] Dkt. 22, Opening Br. in Supp. of Defs.' Mot. to Dismiss Pl.'s Verified Am. Compl. ("Defs. Opening Br.") Ex. A.  The Court may consider the contents of the Consultant Agreement because the Amended Complaint incorporates it by reference.  *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004).

2

4. In early 2019, the Managers adopted a budget for 2019. This budget contemplated that Verdantus and other members would defer portions of their monthly retainers and expense reimbursements until March 12, 2020. The Company pledged to pay 20% annual interest on these deferred amounts. Throughout 2019, Verdantus continued to submit its invoice and expense reports documenting the amount that it was deferring each month. The Company, through Parker, approved these amounts.

5. In July 2019, Parker asked Phillips to prepare an updated budget for the remainder of the year. Phillips complied. The revised budget contemplated that the Company would become insolvent by November or December of 2019. When faced with this conclusion, Parker stated that Feinberg would infuse the Company with $6 million in debt or equity to allow it to continue operating for eighteen additional months.

6. In October 2019, Parker prepared another budget and business plan (the "October 2019 Budget"). The October 2019 Budget projected that the Company would deplete the anticipated $6 million investment from Feinberg over the course of eighteen months until it closed on a project with the New York Metropolitan Transportation Authority (the "NY MTA Project") in April 2021. The October 2019 Budget projected that the NY MTA Project would generate $8.8 million in revenue.

3

7.      The October 2019 Budget also eliminated any payments to Verdantus in 2020 and did not recognize any of the deferred retainer and expense reimbursement payments from 2019.  Rather, the October 2019 Budget noted a debt to Verdantus for "$30,000 in deferred compensation."[6]  Phillips challenged this amount and stated that Verdantus was at least entitled to the total amounts it had deferred in 2019: $75,000 plus 20% interest.  Parker allegedly "advised Phillips that he should take the $30,000, otherwise he would get nothing."[7]  To date, the Company has "not paid any of the money it owes Verdantus under the Consultant Agreement."[8]

8.      The Managers never voted on the October 2019 Budget.  Instead, on November 1, 2019, the Company noticed a meeting of its members "for purposes of removing Phillips as a Manager and terminating the Consultant Agreement."[9]  A meeting was held over Verdantus' objection on November 14.  At that meeting, Parker, Feinberg, and Scott voted to remove Phillips as Manager without cause.  They also voted to terminate the Consultant Agreement effective mid-December 2019, thirty days from the date of the meeting.[10]

---

[6] Am. Compl. ¶ 26.

[7] Id.

[8] Id. ¶ 28.

[9] Id. ¶ 29.

[10] After Phillips was removed as a Manager, his Company email account was shut down and Verdantus was denied access to the Company's books and records.  Verdantus filed a formal inspection request, to which the Company responded with "minimal

9.     After Phillips' removal, Phillips "told Parker and Feinberg that he would be content to hold Verdantus' ownership interest in the Company or have that interest purchased" pursuant to a certain provision of the LLC Agreement.[11] The provision referenced by Phillips does not establish a buy-out right. Rather, the provision establishes a right of first offer and a right of first refusal triggered under certain circumstances, which are not alleged to have occurred, along with a process whereby the Company and the selling member agree to an independent appraisal process.[12]

10.     After Phillips' removal, the Company continued to pay its employees, consultants, vendors, and other members—everyone but Verdantus. Among other payments, Verdantus alleges that the Company paid Parker $30,000 from October 2019 through December 2019.[13] Verdantus alleges that the Company made these payments using funds loaned to the Company by Feinberg, even though the Company simultaneously represented to Verdantus that it was insolvent.

---

information." *Id.* ¶ 36. Verdantus' information rights are not the subject of the dispute currently before the Court.

[11] *Id.* ¶ 32.

[12] *See generally* LLC Agreement Art. XIII.

[13] Verdantus identifies eight additional five-figure payments, although it does not explain how these were wrongful. Am. Compl. ¶ 41. Verdantus further alleges that the Company continued to pay its rent, payroll, accounting, and legal fees in 2020 and that the Company also paid out discretionary bonuses to consultants involved with the NY MTA Project. *Id.*

11.     Verdantus filed this lawsuit on March 13, 2020.[14]   Defendants moved to dismiss Counts II, III, IV, and V of the original complaint on April 14, 2020,[15] and Verdantus amended its complaint on May 15, 2020, removing Phillips as a named Plaintiff.[16]  In the Amended Complaint, Verdantus asserts the following Counts:

- Count I against Parker Infrastructure for breach of the Consultant Agreement and LLC Agreement;

- Count II against all Defendants for fraudulent transfers in violation of the Delaware Uniform Fraudulent Transfer Act (the "DUFTA"); and

- Counts III, IV, and V against the Parker Trust, the Feinberg Trust, and Parker and Feinberg individually for (i) unequal and inequitable treatment in breach of their fiduciary duties, (ii) shareholder oppression in breach of their fiduciary duties, and (iii) breach of the duty of good faith and fair dealing.[17]

---

[14] Dkt. 1, Verified Compl.  Before filing this lawsuit, Verdantus attempted to invoke a mediation provision in the LLC Agreement.  In November 2019, Verdantus delivered notice to the other members that it would seek mediation pursuant to Section 17.19 of the LLC Agreement for the retainer and expense reimbursement payments it was due for October and November 2019 and the removal of Phillips as a Manager.  Verdantus alleges that the Company agreed to mediate but dragged its feet and "allowed Verdantus to spend money on the mediation process . . . , all the while knowing that they would not go through with mediation." Am. Compl. ¶ 46.  The parties engaged in negotiations that allegedly led to a compromise, but Defendants backed out before the parties executed a formal agreement.  On February 28, 2020, Verdantus sent written notice demanding that the Company participate in mediation.  The Company did not respond.  *Id*. ¶ 47.

[15] Dkt. 6, Defs.' Mot. to Dismiss Counts II, III, IV and V of Pl.'s Verified Compl.

[16] Am. Compl.

[17] *Id*. ¶¶ 50–112.

12. Defendants renewed their motion to dismiss,[18] which the parties had fully briefed as of July 8, 2020.[19] The Court held oral argument on July 21, 2020.[20]

## LEGAL ANALYSIS

13. Defendants have moved to dismiss all Counts, except for Count I for breach of the Consulting Agreement, pursuant to Court of Chancery Rule 12(b)(6).[21] Under Rule 12(b)(6), the Court may grant a motion to dismiss if the complaint "fail[s] to state a claim upon which relief can be granted."[22] "[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[23] When considering such a motion, the Court must "accept all well-pleaded factual allegations in the [c]omplaint as true . . . , draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of

---

[18] Defendants do not move to dismiss Count I but instead argue that if Counts II through V are dismissed, then the Court will lack subject matter jurisdiction over Count I because it asserts a cause of action grounded purely in law. Defs.' Opening Br. at 21. At the same time, Defendants represent that they are willing to stipulate to a judgment as to Count I. *Id*. at 7. This Order does not speak to the merits of Count I.

[19] *Id*.; Dkt. 24, Pl.'s Answering Br. in Opp'n to Defs.' Mot. to Dismiss Counts II, III, IV, and V of Pl.'s Verified Am. Compl. ("Pl.'s Answering Br."); Dkt. 28, Reply Br. in Supp. of Defs.' Mot. to Dismiss Pl.'s Verified Am. Compl.

[20] Dkt. 31, Transcript of July 21, 2020 Telephonic Oral Argument on Defs.' Mot. to Dismiss ("Oral Arg. Tr.").

[21] Defs.' Opening Br. at 1.

[22] Ct. Ch. R. 12(b)(6).

[23] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

7

proof."[24]  The Court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[25]

14.  Verdantus asserts Count II as a creditor of Parker Infrastructure.  In Count II, Verdantus asserts that Defendants violated the DUFTA by making "fraudulent transfers to insiders and payments of bonuses to employees that were not contractually required."[26]  Verdantus argues that its Amended Complaint states a claim under Sections 1304 and 1305 of the DUFTA by alleging that the Company "did not receive fair value in return and [the payments] were made with the intent to defraud Verdantus."[27]

15.  Section 1304 enumerates grounds under which present or future creditors can recover from a debtor:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (1) With actual intent to hinder, delay or defraud any creditor of the debtor; **_or_**

---

[24] *Id.* (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[25] *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009).

[26] Am. Compl. ¶ 68.

[27] *Id.*

8

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

a. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

b. Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.[28]

16. Section 1305 enumerates additional grounds under which only present creditors can recover from a debtor:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

(b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time and the insider had reasonable cause to believe that the debtor was insolvent.[29]

17. While Verdantus purports to bring claims under each available subsection of Sections 1304 and 1305, the gravamen of the Amended Complaint raises only two theories: *first*, that the transfers were fraudulent because the

---

[28] 6 *Del. C.* § 1304 (emphasis added).

[29] *Id.* § 1305.

9

Company "did not receive fair value in return," and, *second*, that the transfers were fraudulent because they "were made with the intent to defraud Verdantus."[30] These allegations implicate Section 1304(a)(1), Section 1304(a)(2), and Section 1305(a).[31]

18.   Defendants argue that Verdantus has failed satisfy the elements of Section 1304(a)(1) because the facts pleaded in the Amended Complaint fail to demonstrate that there was an actual intent to defraud.[32] Defendants further argue that Verdantus has failed to satisfy the elements of Sections 1304(a)(2) and 1305(a) because Verdantus has not pleaded that the Company made a transfer "without receiving a reasonably equivalent value in exchange."[33]

19.   Verdantus has failed to plead that the Company acted with the actual intent to defraud.  Intent may be pled generally,[34] and Section 1304(b) provides a list of factors the Court may consider in determining whether a transferor acted with

---

[30] Am. Compl. ¶ 68.

[31] In briefing, Verdantus attempts to expand its theory of the case to include claims under Section 1305(b).  "Briefs relating to a motion to dismiss are not part of the record and any attempt contained within such documents to plead new facts or expand those contained in the complaint will not be considered." *Orman v. Cullman*, 794 A.2d 5, 28 n.59 (Del. Ch. 2002).  In any event, Verdantus does not allege or argue that any transfers to Parker were "for an antecedent debt."

[32] Defs.' Opening Br. at 4, 12–13 (explaining that Parker actually deferred more of his own income to support the continued operation of the Company).

[33] *Id*. at 11–14.

[34] *JPMorgan Chase Bank, N.A. v. Ballard*, 213 A.3d 1211, 1245 (Del. Ch. 2019).

such intent.[35]  Although the "confluence of several of these factors, without the presence of all of them, is generally sufficient to support a conclusion that one acted with the actual intent to defraud,"[36] this Court has recognized that the "fact that a business decision runs contrary to a creditor's generic preference for greater security does not mean that the decision was made with an actual intent to hinder, delay, or defraud any creditor."[37]

20.    The facts pleaded in the Amended Complaint indicate that Verdantus takes issue with business decisions that are contrary to its generic preferences as a creditor, not that Defendants acted with actual intent to defraud.  Verdantus more or less complains of the Company's business decisions to prioritize payment of ordinary course business expenses rather than amounts due to Verdantus under the

---

[35] 6 *Del. C.* § 1304(b) (listing factors that include:  "(1) The transfer or obligation was to an insider; (2) The debtor retained possession or control of the property transferred after the transfer; (3) The transfer or obligation was disclosed or concealed; (4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) The transfer was of substantially all the debtor's assets; (6) The debtor absconded; (7) The debtor removed or concealed assets; (8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.").

[36] *Kilber v. Wooters*, 2007 WL 1756595, at *4 (Del. Ch. June 6, 2007).

[37] *Quadrant Structured Prods. Co. v. Vertin*, 2015 WL 6157759, at *20 (Del. Ch. Oct. 20, 2015), *aff'd*, 151 A.3d 447 (Del. 2016) (describing the inherent tension between creditors' interests and everyday business decisions and concluding that disagreements resulting from this tension do not independently evince actual intent of fraud).

Consultant Agreement. These ordinary course payments include rent expenses, payroll expenses, legal expenses, and payments to consultants other than Verdantus. But none of these payments were concealed—to the contrary, they were disclosed as clear line items on the Company's financial statements, to which Verdantus has access.[38] The allegations do not give rise to a reasonable inference that the Company made these payments with an intent to defraud Verdantus; rather, the allegations give rise to the reasonable inference that the Company made these payments "with the intent to keep the Company operating."[39]

21. Verdantus has also failed to plead that the Company made a transfer without receiving a reasonably equivalent value in exchange. Whether a transferor received "reasonably equivalent value" depends on: "(1) whether the transaction was at arm's length, (2) whether the transferee acted in good faith, and (3) the degree of difference between the fair market value of the asset transferred and the price paid."[40] Verdantus has not pleaded facts sufficient to cast doubt upon any of these elements in the Company's transfers. Verdantus only asserts the conclusory allegation that the challenged transfers were not "contractually required" and thus

---

[38] *See* Am. Compl. Ex. B.

[39] Am. Compl. ¶ 41.

[40] *Seiden v. Kaneko*, 2015 WL 7289338, at *13 (Del. Ch. Nov. 3, 2015) (quoting *In re Plassein Int'l Corp.*, 428 B.R. 64, 67 (D. Del. 2010)).

the Company "did not receive fair value in return."[41] Ultimately, Verdantus does not plead facts from which the Court can reasonably infer that the Company did not receive fair value for these payments.

22.     Verdantus asserts Count III as a member of Parker Infrastructure. In Count III, Verdantus claims that the Parker Trust, the Feinberg Trust, Parker, and Feinberg owe fiduciary duties to Verdantus and that they breached those duties by taking "a course of action meant to unduly pressure Verdantus into selling its interest in [the Company] by refusing to pay Verdantus money [the Company] contractually owes it" as a creditor.[42] At oral argument, Verdantus' counsel conceded that the Company has not invoked any purported right to buy out Verdantus' membership interest.[43] The Complaint contains no allegations to give rise to a reasonable inference that Verdantus is being pressured to accept some implicit offer. Thus, Count III fails for lack of a factual predicate, as it is not reasonably conceivable that Defendants are pressuring Verdantus to sell its interest in the Company.

23.     Verdantus asserts Count IV as a member of Parker Infrastructure. In Count IV, Verdantus claims that the Parker Trust, the Feinberg Trust, Parker, and

---

[41] Am. Compl. ¶ 68.

[42] Pl.'s Answering Br. at 37.

[43] Oral Arg. Tr. at 41–42 (Verdantus' counsel agreeing that any buy-out right is "unilaterally exercised by the [C]ompany" and that the Company has not invoked that right); *id.* at 42 (Verdantus' counsel stating that Verdantus "has no right to invoke" the buy-out provision).

Feinberg breached their fiduciary duties by "embark[ing] on a course of action intended to isolate and oppress Verdantus . . . in an effort to force Phillips to accept less than Verdantus was owed and/or sell Verdantus['] interest in the Company for less than fair value."[44] There is no standalone remedy for stockholder oppression in Delaware.[45] For claims of stockholder oppression, "[t]he entire fairness test, correctly applied and articulated, is the proper judicial approach."[46] Again, Verdantus' claims lack a factual predicate, as discussed in connection with Count III.[47] Again, there are no allegations sufficient to give rise to an inference that Verdantus is being forced to sell its membership interest in the Company, and thus Count IV similarly fails for lack of a factual predicate.[48]

---

[44] Am. Compl. ¶ 88.

[45] *See Nixon v. Blackwell*, 626 A.2d 1366, 1380–81 (Del. 1993) ("It would run counter to the spirit of the doctrine of independent legal significance, and would be inappropriate judicial legislation for this Court to fashion a special judicially-created rule for minority investors when the entity does not fall within those [close-corporation] statutes, or when there are no negotiated special provisions in the certificate of incorporation, by-laws, or stockholder agreements." (citations omitted)).

[46] *Id.* at 1381.

[47] *See supra* ¶ 22.

[48] Verdantus attempts to avoid dismissal of Counts III and IV by relying on this Court's decision in *Litle v. Waters*, 1992 WL 25758, at *6–9 (Del. Ch. Feb. 11, 1992), where the Court denied a motion to dismiss after analyzing a claim for stockholder oppression. *Litle* predated the Supreme Court's decision in *Nixon*, and, even prior to *Nixon*, this Court declined to read *Litle* as establishing a separate cause of action for stockholder oppression. *See Garza v. TV Answer, Inc.*, 1993 WL 77186, at *7 (Del. Ch. Mar. 15, 1993) ("*Litle* appears merely to reiterate the well-established principle of law that, under Delaware law, the declaration of a dividend, like any action of the directors, rests in the discretion of the directors, but that the business judgment rule does not protect the directors if they grossly or fraudulently abuse the discretion entrusted to them by the shareholders."). *Litle* is

24.     Verdantus asserts Count V as a member of Parker Infrastructure.  In Count V, Verdantus claims that the Parker Trust, the Feinberg Trust, Parker, and Feinberg acted in bad faith to force a buy-out of Verdantus' membership interest during the mediation process it pursued.[49]  Verdantus argues that this conduct breached the implied covenant of good faith and fair dealing inherent in the LLC Agreement, and asks the Court to imply "a buy-out term that does not permit the parties to abuse a removed Member by using bad faith actions to pressure it to sell its interest at an unfair price."[50]  As a remedy, Verdantus asks the Court to compel the Company to buy out Verdantus' membership interest.[51]

---

factually distinguishable from the case at hand in any event.  In *Litle*, the plaintiff was a minority stockholder and employee of the company.  After the plaintiff's employment was terminated, the company generated significant taxable income for the plaintiff but failed to issue dividends sufficient to cover taxes due on the income and instead hoarded cash.  The plaintiff claimed in relevant part that the defendant breached his fiduciary duties by violating an oral agreement to make distributions sufficient to cover the taxes.  This Court analyzed the plaintiff's claims under non-Delaware cases concerning stockholder oppression, held that the plaintiff's allegations supported "a classic squeeze out situation: the squeezing out of a minority shareholder by failing to pay dividends," and denied the motion to dismiss.  *Litle*, 1992 WL 25758, at *8–9.  In this case, Verdantus does not allege that Parker Infrastructure hoarded cash and refused to pay distributions or otherwise sought to convert Verdantus' equity stake into a burdensome liability, as was the case in *Litle*.

[49] Am. Compl. ¶ 107.

[50] *Id.* ¶ 110.

[51] *Id.* ¶ 112.

25.     Under Delaware law, the implied covenant is "a limited and extraordinary legal remedy"[52] whose application is a "cautious enterprise."[53] "[T]he implied covenant 'does not apply when the contract addresses the conduct at issue,' but only 'when the contract is truly silent' concerning the matter at hand."[54] "Even where the contract is silent, '[a]n interpreting court cannot use an implied covenant to re-write the agreement between the parties, and should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it.'"[55]

26.     The LLC Agreement is not silent on the matter at hand, rendering the implied covenant inapplicable. The LLC Agreement expressly provides the Company and its Members with an "option, but not an obligation" to buy out a member's interests under certain circumstances.[56] Verdantus asks this Court to

---

[52] *Oxbow Carbon & Mins. Hldgs. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 507 (Del. 2010) (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010)).

[53] *Nemec*, 991 A.2d at 1125.

[54] *Oxbow*, 202 A.3d at 507 (first quoting *Nationwide Emerging Managers, LLC v. Northpointe Hldgs. LLC*, 112 A.3d 878, 896 (Del. 2015), then quoting *Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1033 (Del. Ch. 2006)).

[55] *Id.* at 507 (quoting *Nationwide*, 112 A.3d at 897)

[56] *See* LLC Agreement §§ 4.5 ("To the extent a removed Manager is also a Member or other Interest Holder, such Person's Interest shall be sold by such Person in accordance with Article IX hereof."), 9.2 ("If the Company shall terminate the employment of a Member or other Interest Holder who is an employee, or if an Employee Manager who is also a Member or other Interest Holder is removed as a Manager in accordance with this Agreement, in each case without Cause (as hereinafter defined), the Company or the other Members shall have the option, but not an obligation, to purchase at any time after such

convert the buy-out provision into a mandatory obligation, which would require the Court to rewrite the LLC Agreement. The Court declines to imply such a contractual term when Verdantus could have bargained for it ahead of time.

## CONCLUSION

27.     In sum, Counts II, III, IV, and V are dismissed. The parties shall confer on a path forward with respect to Count I and submit a letter to the Court within fifteen days of this decision regarding the staging of remaining proceedings.

/s/ Kathaleen St. J. McCormick
Vice Chancellor Kathaleen St. J. McCormick
Dated: October 8, 2020

---

termination or removal, and upon the written exercise of such option such Member or other Interest Holder shall sell, all of the Interest owned by such Person.").