# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SARRAF 2018 FAMILY TRUST,<br>GABRIELLA AND ALESSIO TRUST,<br>and THE SSD IRREVOCABLE<br>TRUST,<br><br>      Plaintiffs,<br><br>  v.<br><br>RP HOLDCO, LLC, ROYAL<br>INTERCO, LLC, ROYAL PAPER<br>CONVERTING LLC, AND<br>DOUBLETREE PAPER MILLS, LLC,<br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. N21C-02-006<br>PRW CCLD |

Submitted: October 6, 2022
Decided: October 17, 2022

*Upon Plaintiffs Sarraf 2018 Family Trust et al.'s Motion for Summary Judgment,*
**DENIED.**
*Upon Defendants RP Holdco, LLC et al.'s Motion for Summary Judgment,*
**GRANTED**.

## MEMORANDUM OPINION AND ORDER

David B. Stratton, Esquire, James H. S. Levine, Esquire, TROUTMAN PEPPER HAMILTON SANDERS LLP, Wilmington, Delaware, *Attorneys for Plaintiffs Sarraf 2018 Family Trust, Gabriella and Alessio Trust, and The SSD Irrevocable Trust*.

S. Michael Sirkin, Esquire, Anthony M. Calvano, Esquire, ROSS ARONSTAM & MORTIZ LLP, Wilmington, Delaware; Evan I. Cohen, Esquire, FINN DIXON & HERLING LLP, Stamford, Connecticut, *Attorneys for Defendants RP Holdco, LLC, Royal Interco, LLC, Royal Paper Converting LLC, and Doubletree Paper Mills, LLC*.

**WALLACE, J.**

Plaintiffs Sarraf 2018 Family Trust, Gabriella and Alessio Trust, and the SSD Irrevocable Trust (collectively, the "Trusts" or "Plaintiffs") bring this breach-of-contract action against Defendants RP Holdco, LLC, Royal Interco, LLC, Royal Paper Converting LLC, and Doubletree Paper Mills, LLC (collectively, the "Company" or "Defendants"). Plaintiffs allege Defendants breached the parties' Contingent Payment Agreement ("CPA") when Defendants refused to pay Plaintiffs a lump sum of $5 million. Defendants claim that the triggering condition did not occur, so the $5 million payment never came due.

Plaintiffs moved for summary judgment on Count I (breach of contract), Count II (breach of the implied covenant of good faith and fair dealing), and Defendants' Affirmative Defenses. Defendants also moved for summary judgment on Count I and Count II. For the reasons set forth below, Defendants' Motion for Summary Judgment is **GRANTED**, and Plaintiffs' Motion for Summary Judgment is **DENIED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. THE PARTIES

The Trusts are a collective of individual trusts, including the Sarraf Trust, the Gabriella and Alessio Trust, and the SSD Trust.[1] All three trusts are settled in the

---

[1] *See* Complaint ("Compl.") ¶¶ 6-8, Feb. 1, 2021 (D.I. 1).

State of Nevada and are overseen by one sole trustee, Keyvan Gabbay.[2] The Company is an umbrella term for a collective of entities. RP Holdco and Interco are both Delaware LLCs with their principal places of business in the State of Connecticut.[3] Royal Paper and Doubletree are Arizona LLCs with their principal places of business in the State of Arizona.[4]

## B. FACTUAL BACKGROUND

In mid-2018, a private equity firm, Gridiron Capital, through its affiliate, Gridiron RP Investor, LLC, made an offer to purchase the Trusts' interests in RP Holdco.[5] RP Holdco held interests in Interco, Royal Paper, and Doubletree.[6] Each of these companies manufacture, market, and sell tissue and other paper products to consumers in the United States.[7] The Trusts ultimately accepted Gridiron RP Investor's offer.[8]

On June 15, 2018, the Trusts and Gridiron RP Investor entered into a Membership Interest Purchase Agreement (the "MIPA") to consummate Gridiron RP Investor's purchase of the Trusts' equity interests in RP Holdco (and, by

---

[2]  *Id.*

[3]  *Id.* ¶¶ 9-10.

[4]  *Id.* ¶¶ 11-12.

[5]  *Id.* ¶ 16.

[6]  *Id.* ¶ 17.

[7]  *Id.*

[8]  *Id.* ¶ 18; Answer ¶ 18, Mar. 22, 2021 (D.I. 8).

extension, the Company).[9] Allegedly, to "induce" the Trusts to enter into the MIPA, Gridiron RP Investor caused the Company to enter into the CPA with the Trusts because the Trusts were unwilling to sell their equity in the Company under the MIPA unless there was potential for additional consideration set forth in the CPA.[10]

Ultimately, the Trusts sold their equity in RP Holdco (and, by extension, the Company), which was purchased by Gridiron RP Investor through the MIPA. The Trusts then wanted the Company to purchase U.S. Alliance, as explained below. With that purchase, the Trusts stood to receive a Contingent Payment of $5 million under the CPA.[11]

Section 2 of the CPA addresses the potential "Contingent Payment" of $5 million to which the Trusts believe they're entitled.[12] Section 2.1 states that "[u]pon satisfaction of the Contingent Payment Conditions [in Section 3 of the CPA] during the Payment Period, the Company will pay to the Trusts . . . an amount equal to Five Million Dollars ($5,000,000.00) in the aggregate."[13] Section 3.2 governs the "U.S. Alliance Transaction,"[14] which is the transaction at the center of this litigation (the

---

[9]   Compl. ¶ 19.

[10]  *Id.* ¶¶ 20-21.

[11]  *See* Defs.' Opening Br. in Supp. of Mot. for Summ. J. ("Defs.' Mot. for Summ. J."), Ex. A § 2.1, Aug. 5, 2022 (D.I. 61).

[12]  *See id.*

[13]  *Id.*

[14]  *Id.*, Ex. A § 3.2.

"Transaction").[15] Specifically, Section 3.2 states that the Contingent Payment

Condition (hereinafter the "Condition" or the "U.S. Alliance Transaction

Condition") is deemed satisfied (entitling the Trusts to the $5 million payment) if

any of the following occurs during the Payment Period:

> (i) . . . the Company or its Affiliates consummate a Transaction with U.S. Alliance; or
>
> (ii) . . . the Company or its Affiliates fails to make a written proposal to U.S. Alliance on terms consistent with those in Section 3.2(b) regarding a Transaction within such 150-day period; or
>
> (iii) . . . the Company or its Affiliates declines, refuses or fails to pursue, either orally, in writing or by failing to take any action toward consummation of, a Transaction with U.S. Alliance on commercially reasonable and customary terms, other than as provided in Section 3.2(d) below.[16]

The next subsection of Section 3.2 that is relevant for these motions is Section

3.2(d), which states:

> If the Company and/or an Affiliate enters into a letter of intent with U.S. Alliance and the Company or an Affiliate then declines or fails to pursue a Transaction with U.S. Alliance in accordance with [the parameters laid out in this Section] below, such declination or failure shall not be considered to be a satisfaction of the U.S Alliance Transaction Condition [in Section 3.2(a)] (i.e., the US Alliance Transaction Condition shall not be satisfied).[17]

---

[15] *See* Pls.' Opening Br. in Supp. of Mot. for Summ. J. ("Pls.' Mot. for Summ. J.") at 6, Aug. 5, 2022 (D.I. 60). Many of the Exhibits attached to Defendants' and Plaintiffs' respective Motions for Summary Judgment are the same. The Court herein cites primarily to Defendants' Exhibits solely for the purpose of convenience.

[16] Defs.' Mot. for Summ. J., Ex. A § 3.2(a) (underlining in original).

[17] *Id.*, Ex. A § 3.2(d).

On August 6, 2018, the Company submitted a due diligence request list to U.S. Alliance in preparation for a letter of intent.[18] On December 12, 2018, the Company submitted a letter of intent to U.S. Alliance (the "First LOI").[19] The First LOI proposed a purchase price of $52 million based on a 7.0x multiple of U.S. Alliance's 2017 adjusted EBITDA of $7.395 million.[20] Thereafter, on January 7, 2019, U.S. Alliance sent a return letter to the Company regarding the First LOI.[21] This letter is a major point of contention. The Trusts insist this letter was an "inquiry" and not a counteroffer.[22] The Company says this letter was a rejection and counteroffer.[23] The letter states, in pertinent part, "It was great to speak to [the Company] last Friday on your [First LOI] regarding the potential acquisition of US Alliance paper [sic], Inc. This letter is to summarize our conversation and our *counter offer* to your proposal."[24] This letter from U.S. Alliance sought $60 million,

---

[18] *Id.* at 5, Ex. H.

[19] *Id.* at 6, Ex. J; Pls.' Mot. for Summ. J. at 8, Ex. 5.

[20] Defs.' Mot. for Summ. J at 8; Pls.' Mot. for Summ. J., Ex. 5. "EBITDA" is an abbreviation for "earnings before interest, taxes, depreciation, and amortization." *See* Adam Hayes, *EBITDA: Meaning, Formula, and History*, INVESTOPEDIA (Aug. 10, 2022), www.investopedia.com/terms/e/ebitda.asp.

[21] *See* Defs.' Mot. for Summ. J. at 6-7, Ex. L; Pls.' Mot. for Summ. J. at 8, Ex. 6.

[22] *See* Pls.' Mot. for Summ. J. at 18; Pls.' Br. in Opp'n to Defs.' Mot. for Summ. J. ("Pls.' Answering Br.") at 18, Sept. 7, 2022 (D.I. 69). It should be noted that, for the first time, in an Answering Brief, Plaintiffs raise the argument that this letter is governed by the laws of New York, not Delaware, because "U.S. Alliance is a New York, not Delaware, corporation," and therefore "New York law applies to [the] January 7, 2019 inquiry." Pls.' Answering Br. at 18.

[23] *See* Defs.' Mot. for Summ. J. at 6-7.

[24] Pls.' Mot. for Summ. J., Ex. 6 (emphasis added); Defs.' Mot. for Summ. J., Ex. L (emphasis added).

approximately an 8.0x multiple of the 2017 adjusted EBITDA.[25]

On January 25, 2019, the Company rejected the $60 million proposal by U.S. Alliance.[26] During the following months, it appears the Company and U.S. Alliance continued to stay in contact and discuss a possible sale.[27] Then, on August 6, 2019, the Company submitted a new letter of intent (the "Second LOI").[28] The Second LOI included language the First LOI didn't; specifically, that the offer was "subject to confirmatory diligence and adjustments to reflect the current state of the business."[29] The Trusts take issue with this language because they believe it violates CPA Section 3.2(b). This Section states that Gridiron RP Investor "will or will cause the Company to make a written proposal to U.S. Alliance regarding a Transaction with the Company or its Affiliates on commercially reasonable and customary terms with a purchase price reflecting an enterprise value for U.S. Alliance of at least 7.0x U.S. Alliance's 2017 EBITDA."[30]

In August 2019, in connection with negotiations spurring from the Second

---

[25] Pls.' Mot. for Summ. J., Ex. 6.

[26] Defs.' Mot. for Summ. J. at 7-8, Ex. M.

[27] Defendants frame this time period as one where U.S. Alliance attempted to restart negotiations. *See id.* at 8-10. Plaintiffs frame it as one where U.S. Alliance stated to the Company it didn't reject the First LOI, and that the Company continued to pursue the U.S. Alliance Transaction while the Company acknowledged it "could have used that rejection to declare the U.S. Alliance Condition not satisfied." Pls.' Mot. for Summ. J. at 8-10.

[28] Defs.' Mot. for Summ. J. at 11, Ex. W.

[29] *Id.*, Ex. W at 1.

[30] Pls.' Mot. for Summ. J., Ex. 3 § 3.2(b).

LOI, the Company requested[31] and received full-year financials for 2018 and year-to-date financials for 2019.[32] This is another point of contention because the Trusts believe the Company violated Section 3.2(b) of the CPA[33] and the Company says it didn't violate the CPA in any way.[34] U.S. Alliance signed the Second LOI, but the Trusts did not.[35]

Considering the 2018 and 2019 financial data, the Company proposed a revised purchase price of $33.5 million, down from an initial $52 million offer in the Second LOI, based on an approximately 7.0x multiple of U.S. Alliance's adjusted 2019 EBITDA.[36] On June 30, 2020, U.S. Alliance informed the Company it was rejecting the Company's $33.5 million offer to purchase.[37] On July 7, 2020, the Company sent the Trusts a memo summarizing its evaluation and adjustments relating to the 2018 and 2019 financial data (the "July 7 Memo").[38] The July 7 Memo states that the adjustments were necessary in light of the impact of increased

---

[31] Defs.' Mot. for Summ. J., Ex Y.

[32] *Id.* at 12-13; *see* Pls.' Mot. for Summ. J. at 18.

[33] Pls.' Mot. for Summ. J. at 19-20.

[34] *See* Defs.' Br. in Opp'n to Pls.' Mot. for Summ. J. ("Defs.' Answering Br.") at 12-20, Sept. 6, 2022 (D.I. 68).

[35] Pls.' Mot. for Summ. J. at 18.

[36] Defs.' Mot. for Summ. J. at 14, Ex. AC.

[37] *Id.* at 14, Ex. O at Tr. 176-78.

[38] *Id.*, Ex. AC.

costs associated with U.S. Alliance's raw materials, labor, and freight costs.[39] According to the Company, those adjustments resulted in an adjusted 2017 EBITDA of $967,636.00 and an adjusted 2019 EBITDA of $4,780,306.00.[40]

The July 7 Memo also stated that because U.S. Alliance rejected the Company's offer the CPA's U.S. Alliance Transaction Condition wasn't satisfied and the Company didn't have to pay the Trusts the $5 million Contingent Payment.[41] Moreover, the Company stated in the July 7 Memo that even if U.S. Alliance did not terminate negotiations, the adjustments to the 2017 EBITDA were sufficient to trigger CPA Section 3.2(d)(iii), which gives the Company in such a circumstance the unilateral right not to pursue the Transaction and would result in nonsatisfaction of the U.S. Alliance Transaction Condition.[42]

On September 1, 2020, the Trusts sent a letter to the Company (1) disputing the Company's contentions that U.S. Alliance rejected the offer and (2) disputing the $52 million valuation was overstated.[43] Moreover, the letter demanded that the

---

[39] *Id.*; *see also id.* at 14.

[40] *Id.* at 14.

[41] *See id.*, Ex. AC.

[42] *Id.*; *see also id.*, Ex. A § 3.2(d)(iii) ("The Company will then calculate the implied multiple based upon the . . . diligence findings by dividing the [adjusted valuation] by the Adjusted 2017 EBITDA, and if such implied multiple is more than 10% greater than the LOI Multiple, the Company . . . may elect, in [its] sole and absolute discretion: (1) not to pursue a Transaction, which election shall <u>not</u> be considered satisfaction of the US Alliance Transaction Condition and no Contingent Payment will be earned." (emphasis in original)). The Defendants refer to this Section 3.2(d) as the "Safe Harbor Provision." *See* Defs.' Mot. for Summ. J. at 29-30.

[43] *See* Compl., Ex. D.

Company make the Contingent Payment to the Trusts without delay.[44]  On September 25, 2020, the Company's counsel responded, essentially holding strong to the position that U.S. Alliance rejected the Company's offer, that the valuation was accurate,[45] and that the Company had no obligation to make the Contingent Payment.[46]

## C. PROCEDURAL HISTORY

Last year, the Trusts filed their Complaint against the Company for breach of contract (Count I) and breach of the implied covenant of good faith and fair dealing (Count II) under the CPA.[47]  The Company's Answer denies those allegations and asserts numerous affirmative defenses.[48]

With discovery closed, the parties have now filed cross-motions for summary judgment.  The Court heard argument on those motions earlier this month and the entire matter can be resolved by decision thereon.

## II. STANDARD OF REVIEW

This Court may grant a moving party's motion for summary judgment under Delaware Superior Court Rule 56 only when no genuine issue of material fact exists

---

[44]  *See id.*

[45]  *See id.*, Ex. E.

[46]  *See id.*

[47]  *See* Compl.

[48]  *See* Answer.

and that party is entitled to judgment as a matter of law.[49]  Summary judgment "will not be granted if there is a material fact in dispute"[50] or if "it seems desirable to inquire thoroughly into [the facts] to clarify the application of the law to the circumstances."[51]  The moving party has the burden of demonstrating "its claim is supported by undisputed facts."[52]  If the moving party meets its burden, the burden shifts to the non-moving party to show there is a "genuine issue for trial."[53]  In determining whether such genuine issue exists, "the Court must view the facts in the light most favorable to that non-moving party."[54]  "Lastly, the Court accepts as true the parties' factual stipulations."[55]

"While the Court may not be able to grant summary judgment 'if the factual record has not been developed thoroughly enough to allow the Court to apply the

---

[49]  Del. Super. Ct. Civ. R. 56; *Motors Liquidation Co. DIP Lenders Tr. v. Allianz Ins. Co.*, 2017 WL 2495417, at *5 (Del. Super. Ct. June 19, 2017).

[50]  *Radulski v. Liberty Mut. Fire Ins. Co.*, 2020 WL 8676027, at *3 (Del. Super. Ct. Oct. 28, 2020); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

[51]  *Ebersole v. Lowengrub*, 180 A.2d 467, 468-69 (Del. 1962).

[52]  *Radulski*, 2020 WL 8676027, at *3 (citing *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979)).

[53]  Del. Super. Ct. Civ. R. 56(e); *CNH Indus. Am. LLC v. Am. Casualty Co. of Reading*, 2015 WL 3863225, at *1 (Del. Super. Ct. June 8, 2015) ("If the motion is properly supported, then the burden shifts to the non-moving party to demonstrate that there are material issues of fact for resolution by the ultimate fact-finder.").

[54]  *Radulski*, 2020 WL 8676027, at *3 (citing *Judah v. Del. Tr. Co.*, 378 A.2d 624, 632 (Del. 1977)).

[55]  *Id.*

law to the factual record,'"[56] "a matter should be disposed of by summary judgment whenever an issue of law is involved and a trial is unnecessary."[57]

"These well-established standards and rules for summary judgment apply in full when the parties have filed cross-motions for summary judgment."[58] Cross-motions for summary judgment do "not act *per se* as . . . concession[s] that there [are]" no genuine factual disputes.[59] "But, where cross-motions for summary judgment are filed and neither party argues the existence of a genuine issue of material fact, 'the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the[m].'"[60] "So, 'the questions before this Court are questions of law not of fact, and the parties by filing cross motions for summary judgment have in effect stipulated that the issues raised by the motions are ripe for a decision on the merits."[61]

---

[56] *Id.* at *4 (quoting *CNH Indus. Am. LLC*, 2015 WL 3863225, at *1).

[57] *Jeffries v. Kent Cty. Vocational Tech. Sch. Dist. Bd. of Educ.*, 743 A.2d 675, 677 (Del. Super. Ct. 1999); *Brooke v. Elihu-Evans*, 1996 WL 659491, at *2 (Del. Aug. 23, 1996).

[58] *Radulski*, 2020 WL 8676027, at *4 & n.35 (collecting cases).

[59] *United Vanguard Fund, Inc. v. TakeCare, Inc.*, 693 A.2d 1076, 1079 (Del. 1997).

[60] *Radulski*, 2020 WL 8676027, at *4 (alteration in original) (quoting Del. Super. Ct. Civ. R. 56(h)).

[61] *Id.* (quoting *Health Corp. v. Clarendon Nat'l Ins. Co.*, 2009 WL 2215126, at *11 (Del. Super. Ct. July 15, 2009)).

## III.  PARTIES' CONTENTIONS

### A. THE TRUSTS' MOTION FOR SUMMARY JUDGMENT

The Trusts seek judgment in their favor on (1) Count I (breach of contract), (2) Count II (breach of the implied covenant of good faith and fair dealing), and (3) the Company's affirmative defenses.

First, the Trusts allege the Company breached Sections 2.1 and 3.2 of the CPA.[62]  Specifically, Section 3.2 required the Company to make a written proposal to U.S. Alliance on commercially reasonable and customary terms reflecting a value of at least 7.0x U.S. Alliance's 2017 EBITDA.[63]  The Trusts agree that such an offer was made when the Company sent the First LOI.[64]  But the Trusts insist that U.S. Alliance's response, seeking a value of 8.0x U.S. Alliance's 2017 EBITDA, was an inquiry, not a rejection and a counteroffer as the Company suggests.[65]  The Trusts complain further that the Company's Second LOI did not comply with the terms of the CPA.[66]  According to the Trusts, CPA Section 3.2 permitted the Company to make an offer using only 2017 EBITDA data.[67]  In the Trusts' view, the Company's

---

[62]  Pls.' Mot. for Summ. J. at 17.

[63]  *Id.* at 17, Ex. 3 § 3.2(b).

[64]  *Id.* at 17.

[65]  *Id.* at 17-18.  The Trusts, in a footnote, also argue that the Company's continued efforts to pursue a transaction with U.S. Alliance constitutes a waiver, if any, to declare the U.S. Alliance Transaction Condition not satisfied.  *See id.* at 18 n.58.

[66]  *Id.* at 18-19.

[67]  *Id.* at 19, Ex. 3 § 3.2(b).

use of 2018 and 2019 EBITDA data in constructing the Second LOI was a breach of Section 3.2.[68] To the Trusts, this move by the Company demonstrates breach because: (1) the Company declined, refused, or otherwise failed to pursue the U.S. Alliance Transaction on commercially reasonable and customary terms as required by the CPA;[69] and (2) the Company failed or refused to make the Contingent Payment under Section 2.1.[70]

Second, the Trusts note the CPA does not contain express language allowing or prohibiting the use of 2018 and 2019 EBITDA data and information to evaluate U.S. Alliance's value.[71] The Trusts, as a result of this contractual silence, ask the Court to fill this "gap" in the CPA by restricting the CPA to only 2017 data.[72] The Trusts believe that when Section 3.2 is read as a whole, "it is clear that the intent of the parties is to limit such data and information to 2017."[73] They argue that such a gap-filler would prevent the Company from "unilaterally depriving [the Trusts] of their bargained-for Contingent Payment."[74]

Finally, the Trusts allege that none of the Company's seven affirmative

---

[68]   *Id.* at 19-20.

[69]   *Id.* at 20; *see id.*, Ex. 3 § 3.2(a)(iii).

[70]   *Id.* at 20; *see id.*, Ex. 3 § 2.1(a).

[71]   *Id.* at 22; *see generally id.*, Ex. 3.

[72]   *See id.* at 22.

[73]   *Id.*

[74]   *Id.*

defenses preclude the Court from granting summary judgment in their favor. In essence, the Trusts argue that each affirmative defense consists only of a single, conclusory sentence that fails on its face in light of the Trusts' claims for breach of the CPA and breach of the implied covenant of good faith and fair dealing.[75] The seven affirmative defenses are: failure to state a claim; failure of a condition precedent; duplicative claims; ratification, waiver, acquiescence, laches or estoppel; lack of legally cognizable injury or damage attributable to the Company; unclean hands; and that the CPA itself bars the claims.[76]

## B. THE COMPANY'S MOTION FOR SUMMARY JUDGMENT

The Company seeks judgment in its favor on (1) Complaint Count I (breach of contract), and (2) Complaint Count II (breach of the implied covenant of good faith and fair dealing).

First, the Company contends that the U.S. Alliance Transaction Condition was not satisfied because U.S. Alliance rejected the First LOI.[77] Specifically, the Company says it satisfied its covenant under CPA Section 3.2(b) when it submitted its First LOI,[78] but under Section 3.2(a), the U.S. Alliance Transaction Condition wasn't satisfied because U.S. Alliance sent a rejection and counteroffer on January

---

[75] *Id.* at 22-23.

[76] *See* Answer (listing the Affirmative Defenses).

[77] *See* Defs.' Mot. for Summ. J. at 18.

[78] *Id.* at 18-19.

8, 2019.[79]  As such, the Company argues, any obligation it had to pay was terminated with that rejection.[80]  The Company goes on that even if the CPA still applied to the Second LOI (which the Company believes it does not), that was also pursued on commercially reasonable and customary terms, and the Company already satisfied the obligations of CPA Section 3.2(b) regarding the offer price with the First LOI.[81] In that vein, the Company posits the only issue is whether the Company's offer of 7.0x U.S. Alliance's adjusted 2019 EBITDA was commercially reasonable, not whether the revised offer of $33.5 million complied with Section 3.2(b).[82]  As a final point on the breach-of-contract claim, the Company argues that, even if the July 7 Memo constitutes a failure to pursue a Transaction with U.S. Alliance and the Company remained bound to Section 3.2(b) for the Second LOI, this failure to pursue was excused by Section 3.2(d), the CPA's "safe harbor provision."[83]

Second, the Company suggests that the Trusts' breach of the implied covenant of good faith and fair dealing claim is entirely duplicative of the breach-of-contract claim, and the evidence makes clear the Company acted in good faith within the bounds of the CPA.[84]  Specifically, the Company argues that the Trusts fail to

---

[79]  *Id.* at 19.

[80]  *Id.* at 20-21; *see also id.*, Ex. A § 3.2(a).

[81]  *See id.* at 21.

[82]  *See id.* at 23-24.

[83]  *Id.* at 29.

[84]  *Id.* at 35.

identify any implied terms in the CPA that need to be filled,[85] much less any breach of such implied terms.[86] Even if the Court finds the claim to be not duplicative, the Company says, the evidence demonstrates it acted in good faith.[87]

## IV. DISCUSSION

### A. COUNT I: BREACH OF THE CPA

The elements of a breach-of-contract claim are: "(1) the existence of a contractual obligation; (2) a breach of that obligation; and (3) damages resulting from the breach."[88] "Delaware adheres to the 'objective' theory of contracts, i.e.[,] a contract's construction should be that which would be understood by an objective, reasonable third party."[89] "When the contract is clear and unambiguous, [the Court] will give effect to the plain-meaning of the contract's terms and provisions."[90] But when a contract is subject to multiple reasonable interpretations, the contract is ambiguous.[91] "Contract language is not ambiguous simply because the parties

---

[85] *Id.* at 36.

[86] *Id.*

[87] *Id.*

[88] *Buck v. Viking Hldg. Mgmt. Co. LLC*, 2021 WL 673459, at *3 (Del. Super. Ct. Feb. 22, 2021) (citing *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003)).

[89] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (citing *NBC Universal v. Paxson Commc'ns*, 2005 WL 1038997, at *5 (Del Ch. Apr. 29, 2005)).

[90] *Id.* at 1159-60 (citing *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992)).

[91] *Id.* at 1160.

disagree concerning its intended construction."[92]   When the Court interprets a contract, it "must 'give priority to the parties' intentions as reflected in the four corners of the agreement.'"[93]

### 1. *The First LOI*

The first issue to resolve for the breach-of-contract claim is whether the U.S. Alliance Transaction Condition under CPA Section 3.2 was satisfied by the Company's first proposal—*i.e.* the First LOI—and the response thereto.  The Trusts insist that the January 8, 2019, letter from U.S. Alliance was an inquiry in response to the Company's First LOI, not a rejection and counteroffer.  The Company says it was a rejection and counteroffer, so the U.S. Alliance Transaction Condition was not satisfied.

The Company is right.  The January 8, 2019, letter from U.S. Alliance to the Company was a rejection and counteroffer, not an inquiry.

The Company sent U.S. Alliance its First LOI on December 12, 2018.  It made an offer to acquire U.S. Alliance for $52 million.[94]  Then, on January 8, 2019, U.S. Alliance responded thusly:  "This letter is to summarize our conversation and [U.S.

---

[92]   *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 n.8 (Del. 1997).

[93]   *Bathla v. 913 Mkt., LLC*, 200 A.3d 754, 759 (Del. 2018) (quoting *GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012)).

[94]   *See* Defs.' Mot. for Summ. J., Ex. J.

Alliance's] *counter offer* to [the Company's] proposal."[95]  In that letter, U.S. Alliance proposed a $60 million acquisition.[96]

Under Delaware law, "a response to an offer that is not on the terms set forth by the offeror constitutes a rejection of the original offer and a *counter-offer*."[97]  The First LOI was an offer made by the Company to U.S. Alliance to acquire it for $52 million.  The return letter from U.S. Alliance asked for $60 million.  In other words, it was a "response to [the First LOI] that [was] not on the terms set forth by [the Company,]" and thus "constitutes a rejection of the [First LOI] and a counter-offer."[98]

The Trusts suggest that because U.S. Alliance is a New York corporation, the U.S. Alliance letter from January 8, 2019, must be governed by the laws of New York.[99] But the Court here need not engage in a choice-of-law analysis because the Trusts' argument fails under New York law just as it does under Delaware's.  New York law states that "it is a fundamental tenet of contract law that a counteroffer

---

[95]  *See id.*, Ex. L (emphasis added).

[96]  *Id.*

[97]  *Sandcastle Realty, Inc. v. Castagna*, 2006 WL 2521437, at *2 (Del. Ch. Aug. 16, 2006) (emphasis added); *see also PAMI-LEMB I Inc. v. EMB-NHC, L.L.C.*, 857 A.2d 998, 1015 (Del. Ch. 2004) ("A response to an offer that is not on the terms set forth by the offeror constitutes a rejection of the original offer and a counteroffer."); 1 Bradley W. Voss, *Voss on Delaware Contract Law*, § 2.05[3][c][i] (Lexis 2020) (same).

[98]  *See Sandcastle Realty, Inc.*, 2006 WL 2521437, at *2.

[99]  Pls.' Answering Br. at 18.

constitutes a rejection of an offer as a matter of law."[100]  The January 8, 2019, letter explicitly stated it was a counteroffer and modified the terms of the First LOI by asking for an additional $8 million to acquire U.S. Alliance.  The few off-point New York cases the Trusts rely on to try to transmute that letter to a mere "inquiry" are unhelpful to their cause.[101]  No doubt, under both New York and Delaware law the letter from U.S. Alliance was a rejection and counteroffer.

Because the First LOI was rejected and a counteroffer was provided, Section 3.2(a) comes into play. This Section states that if "the Company makes a written proposal to U.S. Alliance regarding a Transaction on terms consistent with those described in Section 3.2(b) . . . and U.S. Alliance declines to pursue a transaction with the Company or their Affiliates, the US Alliance Transaction Condition shall not be satisfied."[102]  Section 3.2(b) in essence states that the Company had to approach U.S. Alliance and make an offer to acquire it on "commercially reasonable

---

[100] *Jericho Gp., Ltd. v. Midtown Dev., L.P.*, 820 N.Y.S.2d 241, 246-47 (N.Y. App. Div. 2006); *see also Thor Props., LLC v. Willspring Hldgs., LLC*, 988 N.Y.S.2d 47, 49 (N.Y. App. Div. 2014) ("If . . . offeree responds by conditioning acceptance on new or modified terms, that response constitutes both a rejection and a counteroffer which extinguishes the initial offer."); *Solartech Renewables, LLC v. Vitti*, 66 N.Y.S.3d 704, 707 (N.Y. App. Div. 2017) ("[I]f the purported acceptance is qualified with conditions, it is equivalent to a rejection and counteroffer." (internal quotations omitted)).

[101] The Trusts cite to, for instance, *Figueroa v. Prospct Billiards Corp.*, 2019 WL 3415985, at *4 (S.D.N.Y. July 12, 2019), for the proposition that a suggestion, request, or overture is not a counteroffer.  *See* Pls.' Answering Br. at 18.  But in that case, the court held that the email at issue contained indefinite language, making it a suggestion, request, or overture.  *See Figueroa*, 2019 WL 3415985, at *4.  Not so here.  U.S. Alliance's January 8th letter can't be any clearer; it is a "counter offer to [the Company's] proposal."  *See* Defs.' Mot. for Summ. J., Ex. L.

[102] Defs.' Mot. for Summ. J., Ex. A § 3.2(a).

and customary terms" with the purchase price reflecting a value of at least 7.0x U.S. Alliance's 2017 EBITDA.[103]  There is no dispute that the First LOI complied with Section 3.2(b).[104]  There is no doubt that U.S. Alliance rejected the First LOI.  In this event—as CPA Section 3.2(a) makes clear—the U.S. Alliance Transaction Condition was not satisfied and the Contingent Payment is not due to the Trusts.[105]

## 2. *The Second LOI and Subsequent Negotiations*

### a. **The CPA does not apply to the Second LOI.**

The next issue is whether the CPA applied to the Second LOI, and if so, whether the Second LOI complied with the CPA's requirements.  The Trusts contend

---

[103]  *Id.*, Ex. A § 3.2(b).

[104]  *See* Pls.' Mot. for Summ. J. at 17 ("The undisputed facts show that . . . a proposal [on commercially reasonable and customary terms] was made on December 12, 2018 (in the form of the [First] LOI)."); Defs.' Mot. for Summ. J. at 19 ("[W]here, as here, the First LOI complied with Section 3.2(b).").

[105]  *See* Defs.' Mot. for Summ. J., Ex. A § 3.2(a).  Additionally, the Trusts argue that the Company knowingly and intentionally waived any right to declare the U.S. Alliance Transaction Condition as not satisfied after the First LOI because the Company's counsel wrote in a letter, "The Company could have used that [U.S. Alliance] rejection to declare the US Alliance Transaction Condition not satisfied, but instead continued to pursue the Transaction." *See* Pls.' Answering Br. at 17-18; Compl., Ex. E at 2.  In the same letter, counsel wrote, "In sending this letter the Company . . . reserve[s] all rights under the Agreement, the Purchase Agreement and generally." *Id.*, Ex. E at 4.

There was no waiver.  Waiver requires: (1) a condition capable of being waived, (2) the waiving party knows of such condition, and (3) "the waiving party intends to waive that . . . condition." *Amirsaleh v. Bd. of Trade of City of N.Y., Inc.*, 27 A.3d 522, 529-30 (Del. 2011).  Here, the Company clearly did not intend to waive any CPA condition.  The same letter that the Trusts allege constitutes waiver also states a reservation of rights, i.e., no intent to waive.  This, alone, is not enough to meet the "quite exacting" demonstration of a "voluntary and intentional relinquishment of a known right." *Id.* at 529; *see also id.* at 530 (noting that the *Amirsaleh* defendants explicitly waived an election form deadline to accommodate people who missed the deadline, making their waiver "unmistakably clear").

that the CPA applies to the Second LOI and that the Company breached CPA Section 3.2 when it used 2018 and 2019 data and information to construct it. According to them, the CPA would never permit the use of anything more than 2017 data and information in any offer made. The Company says that the CPA does not apply to the Second LOI because Section 3.2(b) was satisfied with the First LOI. And, even if the CPA does apply, the Company's use of 2018 and 2019 data was commercially reasonable—so again there was no breach.

"Delaware adheres to the 'objective' theory of contracts, i.e.[,] a contract's construction should be that which would be understood by an objective, reasonable third party."[106] "When the contract is clear and unambiguous, [the Court] will give effect to the plain-meaning of the contract's terms and provisions."[107] "Contract language is not ambiguous simply because the parties disagree concerning its intended construction."[108] When the Court interprets a contract, it "must 'give priority to the parties' intentions as reflected in the four corners of the agreement.'"[109] The Court "must construe the agreement as a whole, giving effect to all provisions therein."[110] Further, "the meaning which arises from a particular

---

[106] *Osborn*, 991 A.2d at 1159 (citing *NBC Universal*, 2005 WL 1038997, at *5).

[107] *Id.* at 1159-60 (citing *Rhone-Poulenc Basic Chems. Co.*, 616 A.2d at 1195).

[108] *Eagle Indus., Inc.*, 702 A.2d at 1232 n.8.

[109] *Bathla*, 200 A.3d at 759 (quoting *GMG Cap. Invs., LLC*, 36 A.3d at 779).

[110] *E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985).

portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan."[111]

Under a plain reading of the CPA, Section 3.2 was intended to apply to only the First LOI. To begin with, Section 3.2(b), titled the "Covenant to Pursue Transaction," states that within one hundred fifty (150) days of the Closing (unless the parties agree to an extension), the Company will make "*a* written proposal" (an LOI) to U.S. Alliance on commercially reasonable and customary terms, proposing a price of at least 7.0x U.S. Alliance's 2017 EBITDA.[112] The parties did agree to extend the one hundred fifty (150) day deadline in Section 3.2(b) by a month.[113] Within that extension time, the Company submitted the First LOI.[114] Section 3.2(b) is the only Section of the CPA that refers to the controlling time to submit an LOI. The plain language does not appear to account for any subsequent LOI outside the Section 3.2(b)-defined period.

To be sure, in following case law guidance to not permit one provision to control when it runs counter to the contract's overall scheme,[115] no other section of

---

[111] *Id.*

[112] Defs.' Mot. for Summ. J., Ex. A § 3.2(b) (emphasis added).

[113] *Id.* at 6; *see also id.*, Ex. I.

[114] *Id.* at 6-7.

[115] *See E.I. du Pont de Nemours & Co., Inc.*, 498 A.2d at 1113 ("Moreover, the meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan." (citations omitted)).

the CPA clearly states a contrary result. To prove this point, Section 3.2(a), which covers the U.S. Alliance Transaction Condition, states that if the Company makes a written proposal to U.S. Alliance, and U.S. Alliance declines to pursue it, the U.S. Alliance Transaction Condition is not satisfied.[116] Again, U.S. Alliance rejected the Company's First LOI. Section 3.2(a), then, states that the Condition is not satisfied, meaning the Trusts are not entitled to the $5 million Contingent Payment.[117] It follows that any subsequent LOI is not covered by the CPA because the rejection of the First LOI constitutes a conclusion as to any potential Contingent Payment.[118] It would be unreasonable to construe the CPA such that U.S. Alliance could continuously reject proposals and the Trusts' Contingent Payment could still remain on the table. If the parties intended such a result, they could have written it into the CPA.

A plain reading of the CPA leads to one reasonable conclusion—it did not cover the Second LOI.

### b. **Even if the CPA applies to the Second LOI, there was no breach.**

Indulging for a moment that the Second LOI is governed by the language of the CPA, the Court would have to resolve whether the Second LOI complied with

---

[116] Defs.' Mot. for Summ. J., Ex. A § 3.2(a).

[117] *See id.*

[118] *See id.* (describing the U.S. Alliance Transaction Condition); *see also id.*, Ex. A § 2.1 ("Upon satisfaction of the Contingent Payment Conditions during the Payment Period, the Company will pay to the Trusts the Contingent Payments . . . .").

the "commercially reasonable and customary" language of the CPA. The Trusts complain that the Second LOI did not comply, that this constitutes a failure to pursue the Transaction by the Company, and that they are now entitled to the Contingent Payment under Section 3.2(a)(iii).[119] The Company counters that if the CPA applies to the Second LOI, its only obligation was to pursue the Transaction on commercially reasonable and customary terms because it already complied with Section 3.2(b) when it submitted the First LOI.[120]

Section 3.2(b), titled the "Covenant to Pursue Transaction," reads that the Company will make a written proposal to U.S. Alliance "on commercially reasonable and customary terms with a purchase price reflecting an enterprise value of U.S. Alliance of at least 7.0x U.S. Alliance's 2017 EBITDA."[121] The Second LOI—submitted on August 6, 2019—suggested an initial purchase price of $52 million, which was roughly 7.0x U.S. Alliance's 2017 EBITDA of $7.395 million.[122] But the Company ultimately offered to purchase U.S. Alliance for $33.5 million, which was 7.0x U.S. Alliance's 2019 EBITDA of $4.8 million.[123] Again, assuming the CPA governed this offer—was the Company's reliance on the 2019 data in

---

[119] *See* Pls.' Mot. for Summ. J. at 19-20.

[120] Defs.' Mot. for Summ. J. at 21.

[121] *Id.*, Ex. A § 3.2(b).

[122] *See id.*, Ex. W at 1.

[123] Pls.' Mot. for Summ. J. at 12; Defs.' Mot. for Summ. J. at 14, Ex. AD at RFA Resp. 13.

compliance with the CPA? It was.

Recall, the Company complied with the requirements of Section 3.2(b) when it submitted its First LOI to U.S. Alliance. Namely, the First LOI set forth an offer of $52 million that was based on the terms of Section 3.2(b), which required the offer reflect at least 7.0x U.S. Alliance's 2017 EBITDA.[124] Section 3.2(b) references "*a written proposal to U.S. Alliance.*" So nothing therein suggests that the Company had to comply with Section 3.2(b) multiple times.[125] And the Trusts do little to support their postulation that the Company had to comply with Section 3.2(b) after the First LOI.[126]

Next, the CPA does not define "commercially reasonable and customary terms."[127] Instead, it references both "commercially reasonable" and "customary"

---

[124] *See* Defs.' Mot. for Summ. J., Ex. A § 3.2(b), Ex. J ("[The Company] would be prepared to acquire 100% of US Alliance based on a total enterprise value of $52 million ('LOI Purchase Price') . . . . This valuation represents approximately 7.0x ('LOI Multiple') LTM 12/31/2017A Adjusted EBITDA of $7.395 million.").

[125] *See id.* (emphasis added), Ex. A § 3.2(b) ("[N]o later than one hundred fifty (150) days following the Closing . . . [the Company will make] *a written proposal* to U.S. Alliance regarding a Transaction with the Company . . . on commercially reasonable and customary terms with a purchase price reflecting an enterprise value for U.S. Alliance of at least 7.0x U.S. Alliance's 2017 EBITDA." (emphasis added)).

[126] *See* Pls.' Reply Br. at 8-9 ("Plaintiffs argue that Section 3.2 requires any offer be based on U.S. Alliance's 2017 EBITDA and any adjustments to U.S. Alliance's 2017 EBITDA are limited to 2017 information and data."). As discussed further *infra*, this argument fails.

[127] *See generally* Defs.' Mot. for Summ. J., Ex. A.

in various sections of the CPA.[128]  Even when read in context, one cannot glean a particular meaning of the phrase.  As such, under Delaware law, "courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract."[129]  Merriam-Webster defines "commercially reasonable" as "fair, done in good faith, and corresponding to commonly accepted commercial practices."[130]  Further, "customary" is defined as "commonly practiced, used, or observed."[131]  Together, then, "commercially reasonable and customary terms" essentially means the offer must correspond to commonly accepted business practices.[132]

Here, assuming the CPA applied to the Second LOI, the Company's reliance

---

[128] *See, e.g.*, *id.*, Ex. A §§ 2.5 (Subordination), 3.1(b) (Covenant to Pursue Retention of a CEO), 3.2(a)(iii) (U.S. Alliance Transaction Conditions), 3.2(b) (Covenant to Pursue Transaction), 3.2(d)(i) (Excused Failure to Pursue Transaction).

[129] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006); *see id.* ("This is because dictionaries are the customary reference source that a reasonable person in the position of a party to a contract would use to ascertain the ordinary meaning of words not defined in the contract.").

[130] *Commercially reasonable*, MERRIAM-WEBSTER, www.merriam-webster.com/legal/commercially%20reasonable (last visited Oct. 12, 2022); *see also Commercially Reasonable*, *Black's Law Dictionary* (11th ed. 2019) (defining "commercially reasonable" as "in accordance with commonly accepted commercial practice"); *Menn v. ConMed Corp.*, 2022 WL 2387802, at *29 (Del. Ch. June 30, 2022) (noting that the Court of Chancery has previously found that "commercially reasonable" "requires a showing that the determination was in keeping with prevailing trade practice among reputable and responsible business and commercial enterprises" engaged in similar businesses) (internal citations omitted).

[131] *Customary*, MERRIAM-WEBSTER, www.merriam-webster.com/dictionary/customary (last visited Oct. 12, 2022).

[132] *See Commercially reasonable*, MERRIAM-WEBSTER, *supra* note 130; *Customary*, MERRIAM-WEBSTER, *supra* note 131.

on U.S. Alliance's most-recent financial data and information when making a proposed offer to U.S. Alliance is commercially reasonable and customary. Indeed, according to the Trusts' own certified public accountant: "it's reasonable to think [one] would use the periods most current to [a specific] valuation date" when determining the appropriate value of a company.[133] The Trusts contend that the Company's offer calculation made on August 6, 2019 (the Second LOI), should have relied on only 2017 data.[134] A company's value can change over time. To restrict an offer's calculation to outdated financial data, when the CPA does not explicitly require it, is not commercially reasonable.

As a final point, the Trusts suggest that in CPA-speak "commercially reasonable and customary terms" equals "2017 EBITDA" data because to find otherwise would be to ignore the "parties' repeated use of and reference to *2017 EBITDA* . . . in Section 3.2 of the CPA."[135] Not so.

Section 3.2 referenced "2017 EBITDA" a few times. First, it's mentioned in Section 3.2(b)'s "Covenant to Pursue Transaction,"[136] which, as already explained, was satisfied by the First LOI. Second, it's mentioned in Section 3.2(d)'s "Excused Failure to Pursue Transaction," which sets out the equation that excuses the

---

[133] Defs.' Mot. for Summ. J., Ex. AF at Tr. 137.

[134] *See* Pls.' Mot. for Summ. J. at 19-20.

[135] *See id.* (emphasis in original).

[136] *See* Defs.' Mot. for Summ. J., Ex. A § 3.2(b).

Company's failure to pursue a transaction with U.S. Alliance.[137] Only once in the CPA is "commercially reasonable and customary" paired with "2017 EBITDA data." That is in Section 3.2(b), which is already satisfied by the First LOI. And so the Trusts' contention that "commercially reasonable and customary terms" must equal "2017 EBITDA" data[138] has no clear basis in the CPA's language.

Simply put, there is nothing in the CPA to suggest that the use of 2018 and 2019 data when later proposing an offer for $33.5 million is commercially unreasonable or not customary. And the Trusts' own accountant admits that using the most recent financials to determine a company's value is reasonable.[139] Thus, if the Court had to use the CPA to measure the Second LOI, the Company's use of more recent financial data is commercially reasonable and customary.

The Company did not breach the CPA when it submitted its Second LOI and made a final offer for $33.5 million. The Trusts are, therefore, not entitled to the Contingent Payment on this ground.

In sum, the Company's Motion for Summary Judgment on the breach-of-contract claim is **GRANTED**, and the Trusts' motion on this claim is **DENIED**.

---

[137] *See id.*, Ex. A § 3.2(d).

[138] *See* Pls.' Mot. for Summ. J. at 18-19 (arguing that the "CPA was never amended or modified to allow Defendants to make adjustments to U.S. Alliance's 2017 EBITDA using 2018 and 2019 data and information, and all references in Section 3.2 of the CPA are to 2017" and proposing that "commercially reasonable and customary" means only 2017 data).

[139] *See* Defs.' Mot. for Summ. J., Ex. AF at Tr. 137.

## B. COUNT II: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

The Trusts argue that they are entitled to summary judgment on their implied covenant of good faith and fair dealing claim. Specifically, the Trusts allege that the CPA does not contain express language permitting or prohibiting the use of 2018 or 2019 EBITDA data and information to evaluate U.S. Alliance's value. The Trusts ask the Court to restrict the CPA to only 2017 data because they believe that the clear intent of the parties was to limit U.S. Alliance's valuation to 2017 data. On the other side, the Company argues it's entitled to summary judgment on this claim because the Company acted in good faith and within the bounds of the CPA. Further, the Company believes the Trusts failed to identify any implied terms that need to be filled in, let alone the breach of any such terms. It also suggests this claim is duplicative of the breach-of-contract claim.

Under Delaware law, "the implied covenant of good faith and fair dealing attaches to every contract."[140] But to imply a term that was not contracted for by the parties is a "cautious enterprise" that "should be [a] rare and fact-intensive" exercise, which is governed solely by "issues of compelling fairness."[141] In implied covenant

---

[140] *GWO Litig. Tr. v. Sprint Sols., Inc.*, 2018 WL 5309477, at \*5 (Del. Super. Ct. Oct. 25, 2018) (citing *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441-42 (Del. 2005)).

[141] *Id.* (quoting *Dunlap*, 878 A.2d at 442); *see also Cincinnati SMSA Ltd. P'ship. v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998) ("Delaware Supreme Court jurisprudence is developing along the general approach that implying obligations based on the covenant of good faith and fair dealing is a cautious enterprise.").

matters, the "existing contract terms control."[142]  "The implied covenant cannot be used to re-write the agreement,"[143] or "to circumvent the parties' bargain."[144]  "When a sophisticated party 'could have easily . . . drafted [the contract] to expressly' provide a specific contractual protection, the failure to do so cannot be remedied by employing the implied covenant."[145]

The Court will resort to the implied covenant "only when a contract is truly silent with respect to the contested issue," and "only when the Court finds that the parties' expectations on the issue were so fundamental that they clearly would not need to negotiate about nor memorialize them."[146]  The Court "must assess the parties' reasonable expectations at the time of contracting and not rewrite the contract to appease a party who later wishes to rewrite a contract [it] now believes to have been a bad deal."[147]

"To maintain an implied covenant claim, the factual allegations underlying

---

[142] *GWO Litig. Tr.*, 2018 WL 5309477, at \*5; *see also Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009) ("The implied covenant [of good faith and fair dealing] cannot be invoked to override the express terms of the contract.").

[143] *GWO Litig. Tr.*, 2018 WL 5309477, at \*5 (citing *Nationwide Emerging Managers, LLC v. NorthPointe Hldgs., LLC*, 112 A.3d 878, 897 (Del. 2015)).

[144] *Dunlap*, 878 A.2d at 441.

[145] *GWO Litig. Tr.*, 2018 WL 5309477, at \*5 (alteration in original) (quoting *Nationwide Emerging Managers, LLC*, 112 A.3d at 897).

[146] *Id.* at \*6 (citing *Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1032-33 (Del. Ch. 2006)).

[147] *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010) (internal citation omitted).

the implied covenant claim must differ from those underlying an accompanying breach-of-contract claim."[148] Additionally, "[i]f the contract at issue expressly addresses a particular matter, 'an implied covenant claim respecting that matter is duplicative and not viable.'"[149]

Here, the breach-of-contract claim and breach of the implied covenant claim are similarly pled.[150] Were one to look only at the Complaint, the claims would be deemed duplicative.[151] But, when the Court looks at the later gloss added to this claim in the Trusts' briefs, arguably they are not. The Trusts, with their breach of the implied covenant claim, complain that the Company attempted to deprive the Trusts of the benefit of the bargain.[152] Specifically, the Trusts argue that their implied-covenant claim arises from the Company's use of 2018 and 2019 data in formulating the $33.5 million offer—which the Trusts suggest was the Company's unilateral insertion of new terms into the CPA.[153]

---

[148] *GWO Litig. Tr.*, 2018 WL 5309477, at *6 (citing *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 539 (Del. 2011)).

[149] *Id.* (quoting *Edinburgh Hldgs., Inc. v. Educ. Affiliates, Inc.*, 2018 WL 2727542, at *9 (Del. Ch. June 6, 2018) (dismissing an implied-covenant claim as entirely duplicative of a breach-of-contract claim)).

[150] *See* Compl. ¶¶ 50-54 (breach-of-contract claim), 55-57 (breach of implied covenant claim).

[151] *See id.*

[152] Pls.' Mot. for Summ. J. at 22 ("[T]he Court can and should use the implied covenant to fill this gap and prevent Defendants from unilaterally depriving Plaintiffs' of their bargained-for Contingent Payment.").

[153] *See id.*; Pls.' Answering Br. at 26.

That allegation is highly similar to the Trusts' allegation relating to the Second LOI, where they argue that the Second LOI did not comply with the CPA because the Company used 2018 and 2019 data in formulating the $33.5 million offer, and such a move by the Company was a breach of the CPA entitling the Trusts to their Contingent Payment under Section 3.2(a)(iii).[154] But one might find some daylight between the two counts. The breach-of-contract claim focuses on just that—a breach premised on a failure to pursue on commercially reasonable grounds. Contrastingly, the implied-covenant claim focuses on the Company allegedly modifying or amending the CPA to allow for the use of 2018 and 2019 data without the Trusts' consent. While this is a small distinction, "[the Trusts] pleaded various additional facts . . . that provide a separate basis for [their] implied covenant of good faith and fair dealing claim."[155] Thus, the Court will treat the implied-covenant claim here as non-duplicative. But even so, that separate claim fails as a matter of law.

The Trusts' implied-covenant claim fails because they are asking the Court to "re-write the agreement."[156] Both parties agree the CPA contains no express

---

[154] *See* Pls.' Mot. for Summ. J. at 19-20.

[155] *Cent. Mortg. Co.*, 27 A.3d at 539. Although this case discusses an implied-covenant claim under New York law, the requirement that such a claim may not be duplicative of a breach-of-contract claim is also a tenet of Delaware law. *See, e.g.*, *Edinburgh Hldgs., Inc.*, 2018 WL 2727542, at *9 ("Thus, if the contract at issue expressly addresses a particular matter, an implied covenant claim respecting that matter is duplicative and not viable."); *GWO Litig. Tr.*, 2018 WL 5309477, at *6 (same).

[156] *See GWO Litig. Tr.*, 2018 WL 5309477, at *5 (citing *Nationwide Emerging Managers, LLC*, 112 A.3d at 897).

language allowing or prohibiting the use of 2018 and 2019 data and information to evaluate U.S. Alliance's value.[157]  This is not a case where the express terms of the contract cover the complained-of conduct.[158]  So the Court must look to the parties' reasonable expectations at the time of contracting.[159]

The Trusts tell the Court that when Section 3.2 is read as a whole, "it is clear that the intent of the parties is to limit [U.S. Alliance] data and information to 2017."[160]  To support this contention, the Trusts say that to read the CPA otherwise would render meaningless the reference to "2017" before "EBITDA" and the restriction on diligence to U.S. Alliance's largest 2017 customer.[161]  The problem with this contention is that it's not true.  While it is true that "2017" comes directly before "EBITDA" in Sections 3.2(b) and 3.2(d) of the CPA, it does not follow that these references require the CPA, as a whole, be read to exclude the use of 2018 and 2019 data.  The Trusts do little to convince otherwise.

Additionally,  the Trusts also point to the fact that the CPA closed on June 15, 2018, before 2019 data was available.[162]  And finally, the Trusts assert that they

---

[157] *See* Pls.' Mot. for Summ. J. at 22; Defs.' Answering Br. at 14.

[158] *Cf. GWO Litig. Tr.*, 2018 WL 5309477, at *7 (dismissing an implied-covenant claim where the express contract terms governed the complained-of conduct).

[159] *See Nemec*, 991 A.2d at 1126.

[160] Pls.' Mot. for Summ. J. at 22.

[161] *Id.*

[162] Pls.' Answering Br. at 25-26.

"would not have been willing to close on the MIPA without th[e] potential additional consideration offered by the CPA."[163] But neither the closing date, nor the Trusts' current casting of their then-mindset would allow for the insertion of a now-divined term restricting the CPA in all aspects and forevermore to use only 2017 data and exclude 2018 and 2019 data. If the Trusts intended that, they could have written it into the CPA.[164] And in light of all the facts and evidence, the Court cannot find "that the parties' expectations on the issue were so fundamental that they clearly would not need to negotiate about nor memorialize them."[165]

Simply put, if the CPA did govern the Second LOI, the Court cannot rewrite it to preclude the use of 2018 and 2019 data when constructing that later offer. In turn, the Trusts' Motion for Summary Judgment on the breach of the implied covenant of good faith and fair dealing claim must be **DENIED**, and the Company's Motion for Summary Judgment thereon **GRANTED**.[166]

---

[163] Pls.' Reply Br. at 12.

[164] *See GWO Litig. Tr.*, 2018 WL 5309477, at *5 ("When a sophisticated party 'could have easily . . . drafted [the contract] to expressly' provide a specific contractual protection, the failure to do so cannot be remedied by employing the implied covenant." (alteration in original) (quoting *Nationwide Emerging Managers, LLC*, 112 A.3d at 897)).

[165] *Id.* at *6 (citing *Allied Cap. Corp.*, 910 A.2d at 1032-33).

[166] Because the Company's Motion for Summary Judgment is granted with respect to both Count I and Count II, the Trusts' Motion for Summary Judgment on the Company's Affirmative Defenses is **DENIED AS MOOT**.

## V. CONCLUSION

The Defendants neither breached the CPA itself nor any implied covenant thereunder. They were not and are not obliged to make a $5 million lump sum payment to the Trusts because the Contingent Payment Condition was not satisfied. Accordingly, judgment as a matter of law must be **GRANTED** to the Defendants.

**IT IS SO ORDERED**.

_____
Paul R. Wallace, Judge

cc: All Counsel via File and Serve